[Crim. No. 17822. In Bank. Apr. 3, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN W. COLEMAN, Defendant and Appellant.

868

**COUNSEL**

Richard O. Stevens, under appointment by the Supreme Court, for Defendant and Appellant.

Edward T. Mancuso, Public Defender, Gordon H. Armstrong, Deputy Public Defender, Richard A. Bancroft, Ann M. Chargin, Ephraim Margolin, Michael Lewton, Charles C. Marson, Joseph Remcho, Peter E. Sheehan, Alice Daniel, Deborah Hinkel and Paul N. Halvonik as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, John T. Murphy, Kenneth C. Young and James M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

Joseph P. Busch, District Attorney, Harry B. Sondheim and Jay J. Becker, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**WRIGHT, C. J.—** ■ ■■■ Defendant appeals from an order revoking probation granted after the imposition of sentence upon a plea of guilty to a charge of grand theft from the person. (Pen. Code, § 487, subd. 2.)[1] Revocation proceedings were initiated by the District Attorney of the City and County of San Francisco (see § 1203.2, subd. (b)) on grounds which were also the basis for independent criminal charges on which defendant had been held to answer but had not yet been tried. Defendant contends that the revocation of his probation in advance of trial denied him procedural due process because he was forced to forego his opportunity to testify in his own behalf at his revocation hearing in order to avoid incriminating himself at his pending trial. He argues that as long as any testimony which he might have given at his probation hearing could have been used against him at his trial on the related criminal charge, the meaningful opportunity to be heard assured him by *Morrissey* v. *Brewer* (1972) 408 U.S. 471, 489 [33 L.Ed.2d 484, 499, 92 S.Ct. 2593], was essentially nugatory.

We find it unnecessary to adjudicate defendant's constitutional claim, however. Whether or not it actually abridged defendant's constitutional

---

[1] An order revoking probation is appealable as an order made after judgment affecting a defendant's substantial rights. (Pen. Code, § 1237, subd. 2; *People* v. *Vickers* (1972) 8 Cal.3d 451, 453, fn. 2 [105 Cal.Rptr. 305, 503 P.2d 1313].)

Unless otherwise specified all statutory references are to sections of the Penal Code.

rights, the choice forced upon him at his revocation hearing was unnecessarily inconsistent with constitutional values. The substantial arguments advanced by defendant in support of his constitutional claim have persuaded us that, regardless of whether we are constitutionally compelled to do so, in the interests of justice and in the exercise of our inherent supervisory powers over the courts of this state, we should alleviate the hard testimonial choice facing probationers subject to the loss of probation for conduct for which they may also be liable to criminal prosecution.

## I

The circumstances which resulted in the revocation of defendant's probation began evolving early on the morning of December 2, 1972, when Newell Hollingsworth met defendant's common law wife, Shirley Singletary, at a bar where the two danced together for a short time. Immediately after they parted company, Hollingsworth discovered that his wallet was missing and followed Singletary to the nearby hotel at which she resided. Hollingsworth summoned the police and shortly after their arrival Singletary and defendant were observed as they stepped from the hotel elevator. The arresting officer testified that a brief confrontation took place during which defendant denied any knowledge as to the whereabouts of the wallet but subsequently offered to return Hollingsworth's money to him. Following an unproductive search of their hotel room conducted with their consent, defendant and Singletary were taken into custody. At the hotel defendant had claimed to have $123 on his person—nearly the exact amount stolen from Hollingsworth—but at the police station he was able to produce only $40. Defendant first explained the discrepancy by saying that he had forgotten that he had spent some of the money but later admitted that he had given the remainder to Singletary who had concealed it upon her person.[2]

Defendant and Singletary were held to answer on charges of grand theft from the person. Defendant's trial was set for February 5, 1973, and the revocation hearing was scheduled for January 31. On January 19, the People amended the information to charge defendant as an accessory in violation of section 32 and the grand theft charge was then dismissed by the superior court on defendant's motion under section 995. Defendant

---

[2]Apparently no money was found when Singletary was searched at the police station but the arresting officer testified that the police were unable to conduct a full body search.

moved at the revocation hearing for a continuance until after completion of the collateral criminal proceedings. This motion was denied and defendant consequently elected not to testify at the hearing. The matter was submitted on the transcript of the preliminary hearing which had been held on the criminal charge, and defendant's probation was revoked.[3]

## II

We turn first to examination of a probationer's constitutional right to be permitted to speak in his own behalf at his probation revocation hearing. ■ A fundamental requisite of due process is the meaningful opportunity to be heard and to explain one's actions (*Goldberg* v. *Kelly* (1970) 397 U.S. 254, 267-268 [25 L.Ed.2d 287, 298-299, 90 S.Ct. 1011]; *Armstrong* v. *Manzo* (1965) 380 U.S. 545, 552 [14 L.Ed.2d 62, 66, 85 S.Ct. 1187]; *Grannis* v. *Ordean* (1914) 234 U.S. 385, 394 [58 L.Ed. 1363, 1368, 34 S.Ct. 779]), and this right is one of the "minimum requirements of due process" which must be accorded an individual at a probation revocation hearing. (*Morrissey* v. *Brewer, supra,* 408 U.S. at p. 489 [33 L.Ed.2d at p. 499]; *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778, 782 [36 L.Ed.2d 656, 661, 93 S.Ct. 1756]; *People* v. *Vickers* (1972) 8 Cal.3d 451, 457-458 [105 Cal.Rptr. 305, 503 P.2d 1313].) A probationer, moreover, is not limited to denying or defending against a charged violation of the conditions of his probation. Even where a violation is proven or admitted, a probationer has a due process right to explain any mitigating circumstances and argue that the ends of justice do not warrant revocation. (*Morrissey* v. *Brewer, supra,* 408 U.S. at p. 488 [33 L.Ed.2d at p. 498].)

■ The principal policy underlying a probationer's right to an opportunity to be heard at a revocation hearing, as well as the other procedural protections mandated by *Morrissey,* is to assure informed, intelligent and just revocation decisions. (*Morrissey* v. *Brewer, supra,* 408 U.S. at p. 484 [33 L.Ed.2d at p. 496].) "Both the probationer . . . and the State have interests in the accurate finding of fact and the informed use of discretion—the probationer . . . to insure that his liberty is not unjustifiably taken away and the State to make certain that it is neither unnecessarily interrupting a successful effort at rehabilitation nor imprudently prejudicing the safety of the community." (*Gagnon* v. *Scarpelli, supra,* 411 U.S. at p. 785 [36 L.Ed.2d at pp. 663-664].) It is thus detrimental to the state and the probationer alike if probation is revoked

---

[3]Defendant states that the accessory charge against him was subsequently dismissed on the motion of the People pursuant to section 1381.

"because of erroneous information or because of an erroneous evaluation of the need to revoke . . . ." (*Morrissey* v. *Brewer, supra,* 408 U.S. at p. 484 [33 L.Ed.2d at p. 496].)

Another broad policy objective of the constitutional guarantee of an opportunity to testify at a revocation hearing is to enhance the chance of rehabilitating probationers or parolees by treating them with "basic fairness." (*Morrissey* v. *Brewer, supra,* 408 U.S. at p. 484.) Arbitrary or otherwise unfair treatment is likely to generate negative reactions and attitudes at odds with the rehabilitative goals of the penal system.[4]

Both of these policies are seriously undermined when a probationer is deterred by the possibility of self-incrimination from taking advantage of his right to be heard at his probation revocation hearing. When a pending or potential criminal charge forms the basis of an alleged violation of a condition of probation, a probationer who can explain his actions only by jeopardizing his chances of acquittal at a subsequent criminal trial may understandably feel that his opportunity to be heard is more illusory than real and that he is being deprived of his liberty without one of the essential elements of rudimentary fairness—a meaningful chance to speak on his own behalf. Moreover, the deterrent effect of concurrent criminal liability also serves to defeat the intelligent and just exercise of the court's broad discretion in a probation revocation proceeding by impairing the accuracy and restricting the scope of the factfinding process. A probationer is by definition a convicted lawbreaker. Insofar as a probationer seeks at a revocation hearing to deny or contradict the evidence of a probation violation, he is generally at a disadvantage in terms of the credibility of his testimony. His testimony is likely to be more readily accepted, and hence more useful to the court, insofar as it adds to rather than detracts from the factual picture presented by the state, through the probationer's explanation of his actions and account of the circumstances surrounding an alleged probation violation. But such mitigating evidence is just what is most likely to be withheld from the court by virtue of the probationer's fear of self-incrimination, since mitigating evidence often involves damaging factual admissions coupled with more or less compelling moral excuses.

█ It is apparent that the policies served by the due process guarantee of an opportunity for a probationer to be heard at his probation revocation hearing are impinged when he declines to avail

---

[4]See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections (1967) at page 82.

himself of this chance for fear of self-incrimination. Constitutional values are similarly disserved when the probationer resolves the conflict in the opposite way by risking self-incrimination so as to testify at such a hearing.

■ Of the many and varied policies underlying the privilege against self-incrimination,[5] we hold at least two to be adversely affected by permitting a probationer's testimony at his revocation hearing to be used against him at the subsequent criminal trial for the very misconduct at issue in the revocation proceeding.

First, there is the policy of maintaining " 'a fair state-individual balance' " at the subsequent criminal trial " 'by requiring the government . . . in its contest with the individual to shoulder the entire load.' " (*Murphy* v. *Waterfront Comm'n* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681, 84 S.Ct. 1594], quoting from 8 Wigmore, Evidence (McNaughton rev. ed. 1961) § 2251 at p. 317.) Together with the demands of due process that an accused be presumed innocent and that his guilt be established beyond a reasonable doubt (see *In re Winship* (1970) 397 U.S. 358, 361-364 [25 L.Ed.2d 368, 373-375, 90 S.Ct. 1068]; *Coffin* v. *United States* (1895) 156 U.S. 432, 453-456 [39 L.Ed. 481, 491-492, 15 S.Ct. 394]; cf. *Cupp* v. *Naughten* (1973) 414 U.S. 141, 147-150 [38 L.Ed.2d 368, 373-376, 94 S.Ct. 396]), the privilege against self-incrimination requires the prosecution in a criminal trial to produce sufficient evidence to establish the defendant's guilt *before* he must decide whether to remain silent or to testify in his own behalf. (See *Miranda* v. *Arizona* (1966) 384 U.S. 436, 460 [16 L.Ed.2d 694, 715, 86 S.Ct. 1602, 10 A.L.R.3d

---

[5]"The privilege against self-incrimination 'registers an important advance in the development of our liberty—"one of the great landmarks in man's struggle to make himself civilized." ' *Ullmann* v. *United States,* 350 U.S. 422, 426. [Fn. omitted.] It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' 8 Wigmore, Evidence (McNaughton rev., 1961). 317; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,' *United States* v. *Gunewald,* 233 F.2d 556, 581-582 (Frank, J., dissenting), rev'd 353 U.S. 391; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' *Quinn* v. *United States,* 349 U.S. 155, 162." (*Murphy* v. *Waterfront Comm'n* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681-682, 84 S.Ct. 1594].)

974]; *Tehan* v. *Shott* (1966) 382 U.S. 406, 414-416 [15 L.Ed.2d 453, 458-460, 86 S.Ct. 459]; *People* v. *Schader* (1969) 71 Cal.2d 761, 770 [80 Cal.Rptr. 1, 457 P.2d 841].)[6] "[A]n accused has the right," free of any risk of conviction, "to stand mute, clothed in the presumption of innocence, until the prosecution, at the trial, has made out a prima facie case against him." (*People* v. *Talle* (1952) 111 Cal.App.2d 650, 664 [245 P.2d 633].)

The heavy burden thus placed upon the prosecution in a criminal trial to prove through its own investigation the guilt of the defendant may be substantially lightened if the prosecution is allowed to take advantage of the defendant's testimony at a prior probation revocation hearing. Whenever a probationer is charged with a criminal offense the People may, by the simple device of moving to revoke probation prior to trial, seek to force the probationer into a self-incriminatory statement at the revocation hearing. Indeed, to the extent that the object of the prosecution is simply to secure the probationer's incarceration, whether by revocation of probation or by conviction and sentencing for the new offense,[7] the prosecution's instigation of a pretrial probation revocation hearing currently puts it in a "tails we win, heads you lose" position vis-à-vis the probationer. Because of the inapplicability of certain evidentiary rules and the lower standard of proof obtaining at a probation revocation hearing, the People are generally more likely to achieve a probationer's incarceration through the probation revocation process than through the new prosecution and conviction.[8] When a

[6]Compare *Brooks* v. *Tennessee* (1972) 406 U.S. 605, 607-612 [32 L.Ed.2d 358, 360-364, 92 S.Ct. 1891]. See also, 8 Wigmore, Evidence, *supra,* section 2251, at pages 317-318; Ratner, *Consequences of Exercising the Privilege Against Self-Incrimination* (1957) 24 U.Chi.L.Rev. 472, 487-488; Chafee, The Blessings of Liberty (1956) at pages 206-207; Griswold, The Fifth Amendment Today (1962 ed.) at pages 7-10.

[7]For two reasons it may well make little difference in the length of his incarceration if a probationer merely has his probation revoked and with no further criminal proceedings is sentenced to the term prescribed by law for his original conviction, or if a probationer is tried and convicted for a new offense which constitutes a violation of his probation and, following the revocation of his probation due to his conviction of the new offense (see fn. 22, *infra*), is sentenced not only to the term prescribed by law for his new conviction but also is sentenced to the term prescribed by law for his former conviction. First, there is generally a wide range between the minimum and maximum sentences for any given offense and under current law the Adult Authority has extensive discretion in fixing the actual term of imprisonment to be served by a prisoner *regardless* of how many sentences he may have had imposed upon him. Second, it is a frequent practice for a sentencing judge to provide that the sentence imposed is to be served concurrently with any other outstanding sentences.

[8]The United States Supreme Court has taken pains to point out that "the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations. . . . Revocation

probationer is deterred from testifying at his revocation hearing by fears of self-incrimination at his subsequent trial, the People's chances of securing his incarceration through the revocation proceeding are further enhanced. And if a probationer does successfully fight revocation by testifying at the hearing, the People's chances of securing his conviction of a new offense will have been improved by the probationer's having been forced, in effect, to be one of the prosecution's principal witnesses in its case in chief at his trial.[9]

deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions. . . . [¶] . . . We emphasize there is no thought to equate . . . parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." (*Morrissey* v. *Brewer, supra,* 408 U.S. at pp. 480, 489 [33 L.Ed.2d at pp. 494, 499].) Parole and probation revocation proceedings are, of course, equivalent in terms of the requirements of due process. (*Gagnon* v. *Scarpelli, supra,* 411 U.S. at p. 782.) Among the most significant respects in which *Morrissey's* "minimum requirements of due process" (408 US. at p. 489 [33 L.Ed.2d at p. 499]) differ from the "full panoply of rights due a defendant [in a criminal prosecution]" (408 U.S. at p. 480 [33 L.Ed.2d at p. 494]), are with regard to the burden of proof on the state and the admissibility of illegally obtained evidence. A violation of a condition of probation may be established by a "clear and convincing" showing rather than the more demanding standard of proof beyond a reasonable doubt applicable at criminal trials (*People* v. *Hayko* (1970) 7 Cal.App.3d 604, 609-610 [86 Cal.Rptr. 726]; *People* v. *Vanella* (1968) 265 Cal.App.2d 463, 470 [71 Cal.Rptr. 152]), and the Fourth Amendment and *"Dorado-Miranda"* exclusionary rules do not apply at a revocation hearing. (*People* v. *Calais* (1974) 37 Cal.App.3d 898, 904 [112 Cal.Rptr. 685]; *People* v. *Hayko, supra,* 7 Cal.App.3d at pp. 609-610; see also *In re Martinez* (1970) 1 Cal.3d 641, 648-651 [83 Cal.Rptr. 382, 463 P.2d 734].)

[9]The circumstances of the instant case are illustrative of the potential for injustice created when the state moves for a revocation of probation in advance of the trial of a probationer. Defendant's conviction for grand theft from the person carried a sentence of up to 10 years' imprisonment. (§ 489.) The new offense with which he was charged at the time of his probation revocation hearing, that of being an accessory to a felony, is punishable by a maximum of five years' imprisonment. (§ 33.) Moreover, the crime of being an accessory requires specific intent, to wit, knowledge of the underlying felony. Since the perpetrator of the alleged underlying felony in the instant case was defendant's common law wife, defendant may well have associated with her and even received money from her without giving rise to any imperative inferences of guilty knowledge. Defendant's testimony could have been especially instructive on this issue. But if defendant had testified to his relationship with his wife and the circumstances of the evening in question, he would have shouldered a good portion of the prosecution's load at any subsequent trial by conceding virtually all of the facts in the state's case other than his guilty knowledge of the source of the money allegedly handed him by his wife. By exercising his privilege not to ease through his own testimony the prosecution's burden of proving his guilt at trial, defendant gave up his chance to rebut the suspicious circumstances of the evening. He was found in violation of probation and was incarcerated under the 10-year maximum sentence prescribed by law for his earlier conviction of grand theft. Not surprisingly, the prosecution has since elected not to pursue the new charge of being an accessory, which it would have had to prove without the benefit of the statement defendant failed to make at the revocation hearing, and

The second policy underlying the privilege against self-incrimination which is undermined by forcing a probationer to choose between the privilege and his opportunity to be heard at his revocation hearing, is our "unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt." (*Murphy* v. *Waterfront Comm'n, supra,* 378 U.S. at p. 55 [12 L.Ed.2d at p. 681].) Although a probationer is not faced with contempt if he remains silent at his revocation hearing, he may well find himself in an analogous predicament. He might, as we have stated, seriously incriminate himself if he exercises his right to be heard, particularly where his testimony would consist of a truthful explanation of mitigating circumstances surrounding the charged proba-tion violation. If he remains silent he not only loses his opportunity to present a conceivably convincing case against revocation but also incurs the risk that notwithstanding the ideals of the Fifth Amendment his silence will be taken as an indication that there are no valid reasons why probation should not be revoked. To avoid the adverse effects of the foregoing alternatives, the probationer may be tempted to testify falsely in a manner which will not damage his defense at a subsequent criminal trial.

Thus, when an alleged probation violation also constitutes a criminal offense for which the probationer might subsequently be prosecuted, he may be presented with the "cruel trilemma" of self-accusation, perjury or injurious silence. To force an individual to choose one of three such unpalatable alternatives runs counter to our historic aversion to cruelty reflected in the privilege against self-incrimination.

III

However evident it may be that requiring a probationer to choose between testifying at his revocation hearing and incriminating himself at a later trial creates a tension between countervailing constitutional rights, it is far from clear that we are under any constitutional duty to obviate this tension. The federal law on the subject is currently in a state of confusion.

The United States Supreme Court adopted an accommodating stance toward such tensions in *Simmons* v. *United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967]. The court there confronted a situation in which a defendant had given incriminating testimony in support of a

which on conviction would have produced a sentence of one-half the maximum of that under which defendant is presently incarcerated.

motion to suppress evidence allegedly seized in violation of the Fourth Amendment and the government had subsequently used this testimony against the defendant at trial on the issue of guilt.[10] Mr. Justice Harlan, writing for the court, observed that such use of the defendant's suppression-motion testimony operated to impose on the good faith assertion of Fourth Amendment rights a condition "of a kind to which this Court has always been peculiarly sensitive" (*id.*, at p. 393 [19 L.Ed.2d at p. 1258]), for it involved the incrimination of the defendant by his own words. The court reasoned that, in effect, the defendant "was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or . . . to waive his Fifth Amendment privilege against self-incrimination." Finding it "intolerable that one constitutional right should have to be surrendered in order to assert another" (*id.*, at p. 394 [19 L.Ed.2d at p. 1259]), the court held that the government was constitutionally prohibited from offering at trial as evidence of guilt the testimony of the defendant in support of his motion to suppress evidence on Fourth Amendment grounds.[11]

Three years later the court demonstrated its discomfort with the practical implications of its broad ruling in *Simmons* that procedurally created tension between constitutional rights was "intolerable." As if to emphasize that the court was reconsidering the rationale of *Simmons* rather than merely distinguishing it on its facts, Mr. Justice Harlan was again assigned to write the opinion for the court when, in *McGautha v. California* (1971) 402 U.S. 183 [28 L.Ed.2d 711, 91 S.Ct. 1454], it considered a constitutional attack upon Ohio's "unitary" trial procedure whereby both guilt and punishment in capital cases were determined at a

---

[10]In order to establish his standing to suppress the evidence on Fourth Amendment grounds, the defendant in *Simmons* admitted that he was the owner of the challenged items of evidence. Under the circumstances this admission was very damaging to defendant at the trial. (390 U.S. at p. 391 [19 L.Ed.2d at p. 1257].)

[11]The *Simmons* exclusionary rule provides: "[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." (390 U.S. at p. 394 [19 L.Ed.2d at p. 1259].)

Although it is not without ambiguity, this carefully wrought language would seem to preclude only the "affirmative" use of a defendant's testimony at a suppression hearing. Compare pages 891-892, *infra*. This reading of *Simmons* gains support from the wording of the court's recent unanimous reaffirmation of the *Simmons* rule in *Brown v. United States* (1973) 411 U.S. 223, 228 [36 L.Ed.2d 208, 213, 93 S.Ct. 1565]: "[U]nder the *Simmons* doctrine the defendant is permitted to establish the requisite standing by claiming 'possession' of incriminating evidence. If he is granted standing on the basis of such evidence, he may nonetheless press for its exclusion; but, whether he succeeds or fails to suppress the evidence, his testimony on that score is not *directly* admissible against him in the trial." (Italics added.)

single trial.[12] Under Ohio's single-trial system any testimony on the issue of punishment could be used against the defendant on the issue of guilt, and it was argued in *McGautha* that such a procedure unconstitutionally compelled the defendant to choose between personally speaking to the jury on the issue of punishment and exercising his privilege against self-incrimination.

In rejecting the claim that a bifurcated system was constitutionally mandated, the majority in *McGautha* concluded that *Simmons* should not be read as invalidating all procedures which produce *some* tension between constitutional rights. Observing that "[t]he criminal process . . . is replete with situations requiring 'the making of difficult judgments' as to which course to follow," and that "[a]lthough a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose," the court declared the "threshold question" to be "whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." (402 U.S. at p. 213 [28 L.Ed.2d at p. 729].)

From the manner of its application in *McGautha,* it appears that this test is likely to be more dispositive than the court's "threshold" characterization would imply. The determinations of what are constitutional policies, when such a policy is impaired, and whether the impairment is "appreciable," would seem to involve value judgments controlling of the question of the permissibility in a given context of procedures imposing upon litigants a choice between constitutional rights. Thus the *McGautha* court admitted that one policy ostensibly underlying the privilege against self-incrimination, that of avoiding cruelty, might be "affected" to an appreciable degree insofar as "[i]t is

---

[12]The challenge to the unitary trial system was raised by the petitioner in *Crampton* v. *Ohio,* which the Supreme Court consolidated with *McGautha* v. *California.* The Supreme Court itself has been inconsistent in citing to the unitary trial portions of *McGautha* under the title of both *McGautha* (see *Brooks* v. *Tennessee* (1972) 406 U.S. 605, 609 [32 L.Ed.2d 358, 362, 92 S.Ct. 1891] and *Crampton* (see *Chaffin* v. *Stynchcombe* (1973) 412 U.S. 17, 31 [36 L.Ed.2d 714, 726, 93 S.Ct. 1977]). For convenience our citation to the discussion in *McGautha* of petitioner Crampton's claim that Ohio's unitary trial system in capital cases unconstitutionally burdened his right to remain silent at the trial of his guilt, will be to the running head used throughout the opinion bearing that discussion, to wit, *McGautha* v. *California.* This style also avoids confusion relating to the fact that in the wake of its holding that the death penalty could not be imposed discretionarily (*Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]), the Supreme Court granted a rehearing and vacated its earlier judgment affirming the imposition of the death penalty in *Crampton* v. *Ohio.* (*Crampton* v. *Ohio* (1972) 408 U.S. 941 [33 L.Ed.2d 765, 92 S.Ct. 2873].)

undeniably hard to require a defendant on trial for his life and desirous of testifying on the issue of punishment to make nice calculations of the effect of his testimony on the jury's determination of guilt." (402 U.S. at p. 214 [28 L.Ed.2d at p. 730].) Yet the court ruled that the policies of the privilege were not "offended" by a defendant in a capital case yielding "to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt" (*id.,* at p. 217 [28 L.Ed.2d at p. 732]), in view of the "clear validity of analogous choices with which criminal defendants and their attorneys are quite routinely faced." (*Id.,* at p. 215 [28 L.Ed.2d at pp. 730-731].)[13]

The court in *McGautha* made little effort to reconcile its reasoning with that which had preceded it in *Simmons*. It noted that "not everything said in [*Simmons*] can be carried over to this case without circumspection" (*McGautha* v. *California, supra,* 402 U.S. at p. 211 [28 L.Ed.2d at p. 728]), and adverting to the "insubstantiality of the purely Fifth Amendment interests involved in *Simmons*" (402 U.S. at p. 212 [28 L.Ed.2d at p. 729]), implied that *Simmons* should have been decided on the basis of the court's supervisory powers over federal trials rather than the mandates of the Constitution. In sum, the court concluded that "[w]hile we have no occasion to question the soundness of the result in *Simmons* and do not do so, to the extent that its rationale was based on a

---

[13]"It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. [Citations omitted.] It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination. It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like. [Citations omitted.] Again, it is not thought inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify.

"Further, a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty. [Citations omitted.] Finally, only last Term in *Williams* v. *Florida,* 399 U.S. 78 (1970), we had occasion to consider a Florida 'notice-of-alibi' rule which put the petitioner in that case to the choice of either abandoning his alibi defense or giving the State both an opportunity to prepare a rebuttal and leads from which to start. We rejected the contention that the rule unconstitutionally compelled the defendant to incriminate himself. The pressures which might lead the defendant to furnish this arguably 'testimonial' and 'incriminating' information arose simply from 'the force of historical fact beyond both his and the State's control and the strength of the State's case built on these facts. Response to that kind of pressure by offering evidence or testimony is not compelled self-incrimination transgressing the Fifth and Fourteenth Amendments.' *Id.,* at 85." (*McGautha* v. *California, supra,* 402 U.S. at pp. 215-216 [28 L.Ed.2d at p. 731]; cf. *Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834 [117 Cal.Rptr. 437, 528 P.2d 45] [rejecting judicial promulgation of notice-of-alibi procedure].)

'tension' between constitutional rights and the policies behind them, the validity of that reasoning must now be regarded as open to question . . . ." (402 U.S. at p. 212 [28 L.Ed.2d at p. 729].)

The impact of *Simmons* and *McGautha* on probation revocation proceedings which precede the disposition of related criminal charges was the precise issue before the court in the recent case of *Flint* v. *Mullen* (1st Cir. 1974) 499 F.2d 100. In Rhode Island, as heretofore in California, a probationer subject to the revocation of probation for alleged conduct also at issue in concurrent criminal proceedings must choose between full enjoyment of his privilege against self-incrimination at trial, and the exercise of his right to be heard at his revocation hearing. *Flint* held that this was the sort of constitutionally permissible "strategic" choice sanctioned in *McGautha.*

*Flint* was decided by a split court. The arguments and authorities marshalled by both sides bear directly on the problem posed by the instant case. The dissent in *Flint* saw great potential for abuse in allowing the state "to time the violation [of probation] hearing, with its lower burden of proof, so that it comes before the criminal trial on the same charge, enabl[ing] the government to gain evidence for the criminal trial the easy way." (499 F.2d at p. 105.) Conversely, the dissent saw little inconvenience to the state in requiring it to choose either to grant a probationer immunity for his testimony at his revocation hearing or to postpone the revocation hearing until after trial on the related charges, using bail conditions or similar means to keep pretrial control over the alleged probation violator. (*Id.* at p. 106.)

The dissent relied primarily on *Palmigiano* v. *Baxter* (1st Cir. 1973) 487 F.2d 1280, 1288-1290, vacated (1974) 418 U.S. 908 [41 L.Ed.2d 1155, 94 S.Ct. 3200] (see fn. 15, *infra*), which held that "[w]here the possibility exists of [a state prison] inmate being penalized for the same criminal conduct in a disciplinary hearing and a criminal trial, he should be entitled to 'use' immunity for statements he might make within the prison disciplinary hearing." (*Id.,* at p. 1289.) *Palmigiano* deemed the "provision of use immunity" to be "a rational accommodation between the imperatives of the privilege against self-incrimination and the legitimate requirements of prison disciplinary procedures." (*Id.,* at p. 1290.) *McGautha* was distinguished by *Palmigiano* as permitting a choice between constitutional rights in a criminal proceeding only when either option offers the defendant a viable "strategic alternative." (487 F.2d at pp. 1288-1289, fn. 21.) In *McGautha* the choice of remaining silent at

trial was "strategic" in view of the many procedural and substantive burdens imposed upon the prosecution at a criminal trial. By contrast *Palmigiano* proceeded principally upon the premise that the minimal due process afforded at a prison disciplinary hearing gives an accused prisoner almost no effective defense other than his own testimony. (487 F.2d at pp. 1288-1289 and fn. 21.)[14] *Palmigiano* also seemed to distinguish *McGautha* by implication on the more amorphous ground that since there are no absolute requirements of how much process a prisoner is due, the question of entitlement to use immunity must be considered as part of the general balancing of interests associated with due process, rather than under the more specialized rules governing the scope of the privilege against self-incrimination. (See 487 F.2d at pp. 1282-1283, 1285-1288.)[15]

The *Flint* majority refused to apply *Palmigiano* outside of its immediate factual context. Three distinctions were drawn between the probation revocation proceedings at issue in *Flint* and the prison disciplinary hearing of *Palmigiano*. Under Rhode Island law, (1) an adverse finding at a revocation hearing cannot be premised on the probationer's refusal to testify; (2) a probationer has access to more extensive assistance of and has greater powers to call and cross-examine

---

[14]Indeed, although the opinion did not emphasize this fact, the plaintiff in *Palmigiano* had been specifically informed that an adverse inference would be drawn from his remaining silent at his disciplinary hearing. The *Palmigiano* opinion treated this fact as just one of many ways in which the accused in a prison disciplinary hearing is in a more disadvantageous position than the accused in a conventional criminal trial.

[15]*Palmigiano* has recently been vacated and remanded for further consideration in light of *Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963], in which the Supreme Court for the first time set minimum procedural due process standards for prison disciplinary hearings. *Wolff* held that the procedural due process required at a prison disciplinary hearing was even more rudimentary than that required incident to the revocation of parole or probation under *Morrissey* and *Scarpelli*. (418 U.S. at pp. 559-572 [41 L.Ed.2d at pp. 952-960].) Thus *Wolff* would seem to reinforce the major premise of *Palmigiano:* that remaining silent at a prison disciplinary hearing is not a viable "strategic" alternative for an accused inmate, because the inmate has no effective defense other than his own testimony. *Wolff* also added support to *Palmigiano's* implicit minor premise: that because use immunity greatly aids the inmate in his defense while imposing little consequent burden on the state, such immunity may appropriately be required as part of the untechnical balancing of interests determinative of how much process is due behind prison walls. *Wolff* readily admitted to taking a "balance of interests" approach, and characterized the procedural rights announced therein as "not graven in stone" but merely the court's best judgment at the present time as to the most "reasonable accommodation between the interests of the inmates and the needs of the institution." (418 U.S. at pp. 568, 572 [41 L.Ed.2d at pp. 958, 960].) Thus *Palmigiano's* provision of use immunity for pretrial prison disciplinary hearing testimony would seem to be entirely consistent with *Wolff.*

witnesses than does the accused in a prison disciplinary proceeding;[16] and (3) a revocation hearing is a judicial proceeding which if resolved favorably to the probationer may collaterally estop subsequent proceedings.[17] But over and above these factual distinctions, the *Flint* majority voiced concern over the wide ramifications of an expansive reading of *Palmigiano*. "If the risk of an adverse judgment in the violation hearing were to be viewed as a penalty upon petitioner's right to remain silent in his subsequent criminal trial, stemming from the same incident, the same characterization would, no doubt, apply to the risk of an adverse judgment in any proceeding in which there is a recognized due process right to be heard and which is based on the same fact situation as a subsequent criminal trial. The result of such a broad rule might be to immunize whole classes of testimony from use in subsequent criminal trials, and place an unwarranted burden upon the state." (499 F.2d at p. 104.)

The *Flint* majority apparently had in mind the difficult problem of concurrent civil and criminal proceedings. (See generally Note (1968) 66 Mich.L.Rev. 738; Note, *Concurrent Civil and Criminal Proceedings* (1967) 67 Colum.L.Rev. 1277.) ■ It seems fairly clear that one liable to criminal prosecution who undertakes *himself* to litigate related issues as a *plaintiff* in a civil suit, is entitled to no relief from the peril of self-incrimination. (See *Simmons* v. *United States, supra,* 390 U.S. at p. 394 and fn. 23 [19 L.Ed.2d at p. 1259].) More troublesome is the plight of a defendant in a criminal prosecution who must also defend against civil proceedings involving the same facts. The defendant may well be

---

[16]This distinction between the procedural posture of a probationer facing revocation and an inmate facing prison discipline is of increased substance in view of the United States Supreme Court's opinion in *Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963], which was decided one day after *Flint.* As adumbrated in footnote 15, *supra, Wolff* granted prisoners accused of disciplinary infractions even fewer procedural rights than they were credited with by *Palmigiano. Wolff* held that there was no right of an accused in a prison disciplinary proceeding to have the assistance of counsel or to confront and cross-examine adverse witnesses. (418 U.S. at pp. 567-570, 572, fn. 20 [41 L.Ed.2d at pp. 957-959, 960].) In *Palmigiano* the inmate was held entitled to retained counsel, and had rights of confrontation and cross-examination under judicially inspired prison regulations which the state is apparently free to revise in the wake of *Wolff.* (See 487 F.2d at pp. 1285, fn. 13, 1290-1292.)

[17]In a footnote the *Flint* majority ventured that "The timing of the hearing before the criminal trial may not be all to the accused's detriment. If the Court found that the accused did not commit the crime, that finding might well be *res judicata.* See 1B J. Moore, Federal Practice ¶0.418[1], at 2702, n. 5 (2d ed. 1974)." (*Flint* v. *Mullen, supra,* 499 F.2d at p. 103, fn. 4.) The cited authority suggests that the policies of the doctrine of collateral estoppel would support the doctrine's application to bar a criminal prosecution where the same issues have been raised in a prior civil proceeding in which the government was the adverse party.

required to make incriminating admissions if he is to have a meaningful chance of avoiding the loss through judicial process of a substantial amount of property. Some courts have been sympathetic to such a situation and have stayed the civil proceedings until disposition of the related criminal prosecution. (See, e.g., *National Discount Corp.* v. *Holzbaugh* (E.D.Mich. 1952) 13 F.R.D. 236, 237; cf. *United States* v. *Kordel* (1970) 397 U.S. 1, 9 [25 L.Ed.2d 1, 8-9, 90 S.Ct. 763].) Other courts have refused to go beyond allowing civil defendants to refuse to answer particular questions propounded in the course of discovery by expressly invoking their privilege against self-incrimination. (See, e.g., *In re Penn Central Securities Litigation* (E.D.Pa. 1972) 347 F.Supp. 1347, 1348.)

Whatever their response to requests for accommodation of the conflicting constitutional rights of a defendant in concurrent civil and criminal proceedings, courts have consistently refrained from recognizing any *constitutional* need for such accommodation. Rather, the alleviation of tension between constitutional rights has been treated as within the province of a court's discretion in seeking to assure the sound administration of justice. "There may be cases where the requirement that a criminal defendant participate in a civil action, at peril of being denied some portion of his worldly goods, violates concepts of elementary fairness in view of the defendant's position in an inter-related criminal prosecution. On the other hand, the fact that a man is indicted cannot give him a blank check to block all civil litigation on the same or related underlying subject matter. Justice is meted out in both civil and criminal litigation. The overall interest of the courts that justice be done may very well require that the compensation and remedy due a civil plaintiff should not be delayed (and possibly denied). The court, in its sound discretion, must assess and balance the nature and substantiality of the injustices claimed on either side." (*Gordon* v. *Federal Deposit Insurance Corporation* (1970) 427 F.2d 578, 580 [138 App.D.C. 308].)

It is apparent from analysis of *Simmons, McGautha, Flint* and analogous authority that cases presenting problems of conflicting constitutional rights have key constant and variable elements. In every case one set of constitutional rights arises as an incident of liability to criminal prosecution. What varies is the nature of the concurrent proceedings giving rise to a conflicting set of rights. At one end of the spectrum of concurrent proceedings are those which accord the defendant minimal procedural rights but which have the potential of imposing serious personal deprivations. Prison disciplinary hearings epitomize this class. The need for accommodation is here the greatest, and may well be

constitutionally compelled. If already minimal procedural protections are further eroded by the need to preserve intact the defendant's full rights at a pending criminal trial, there are insufficient safeguards against the imposition of arbitrary deprivations at the concurrent proceeding. At the other end of the spectrum, the concurrent proceeding may accord the defendant a high degree of procedural protection against arbitrariness, as is the case with civil litigation. Here the need for accommodation is far less compelling, and does not appear to be of constitutional dimensions. In such circumstances the defendant's choice as to the better forum—civil or criminal—in which to make his case is generally one of strategy rather than desperation. Somewhere between these poles lies the revocation hearing at issue in the instant case.

## IV

This spectral analysis of the need for accommodation of the constitutional rights of a defendant in concurrent proceedings gives rise to two propositions of general validity. First, there emerges the infeasibility of propounding a constitutional rule of universal applicability. Second, it follows that there may be a wide gap between the minimum standards of fundamental fairness required by the federal Constitution and standards consistent with the enlightened administration of justice for which each state through its courts is independently responsible in the exercise of its residual sovereignty. The first proposition counsels us that there is little to be gained in terms of constitutional jurisprudence by our proceeding to determine as a matter of constitutional law the permissibility of the choice between constitutional rights required of defendant by the court below. The second proposition suggests that clothing our adjudication of the issues before us in constitutional raiment would be not only unwise but also unnecessary.

In this connection, it is instructive to note that both *McGautha* and *Flint* bear codas which fairly invite the states to effect in the interests of justice the accommodation held in those cases not to be constitutionally required. In *McGautha* Mr. Justice Harlan literally went out of his way to emphasize that the court's decision therein reflected a reluctance to enshrine more than the barest essentials of fair procedure as constitutional imperatives, and did not necessarily or even probably comport with the justices' views as to socially desirable criminal procedures.

"Before we conclude this opinion, it is appropriate for us to make a broader observation than the issues raised by these cases strictly call for.

It may well be, as the American Law Institute and the National Commission on Reform of Federal Criminal Laws have concluded, that bifurcated trials and criteria for jury sentencing discretion are superior means of dealing with capital cases if the death penalty is to be retained at all. But the Federal Constitution, which marks the limits of our authority in these cases, does not guarantee trial procedures that are the best of all worlds, or that accord with the most enlightened ideas of students of the infant science of criminology, or even those that measure up to the individual predilections of members of this Court. See *Spencer* v. *Texas,* 385 U.S. 554 (1967). The Constitution requires no more than that trials be fairly conducted and that guaranteed rights of defendants be scrupulously respected." (402 U.S. at pp. 220-221 [28 L.Ed.2d at p. 734].)[18]

The *Flint* majority similarly disclaimed any endorsement of the wisdom of the state prison disciplinary hearing procedures which they held nonetheless to be constitutional.

"To the extent that petitioner's argument is based upon what seems to be an unfair consequence of holding the violation hearing before the criminal trial—that petitioner could be convicted of violating his deferred sentence agreement, only to be acquitted, pursuant to a higher burden of proof, at his criminal trial—we sympathize. [Fn. omitted.] In the ordinary case, we see little public interest served by this kind of

[18]Mr. Justice Harlan had intimated earlier in *McGautha* that accommodation of tensions between constitutional rights was better handled without invocation of the Constitution itself, when he implied that *Simmons* should have been premised on the Supreme Court's supervisory role over the lower federal courts, rather than on constitutional grounds. See page 879, *supra.* The idea that the Constitution should be construed as setting only threshold standards of rudimentary fairness, with further embellishments of procedure left to the states and the federal courts as independent jurisdictions, was of course a central tenet of Mr. Justice Harlan's personal judicial philosophy, but one which, until recently, frequently failed to command the support of the Supreme Court (see, e.g., *Duncan* v. *Louisiana* (1968) 391 U.S. 145, 171 [20 L.Ed.2d 491, 508, 88 S.Ct. 1444] (dissenting opinion)), notwithstanding occasional cases in which Mr. Justice Harlan's views did prevail, as in *Spencer* v. *Texas,* cited in the above-quoted passage from *McGautha.* Ironically, *McGautha,* one of Mr. Justice Harlan's last opinions, may have marked a shift in the court towards acceptance of his notions of due process and federalism, with the result that in his absence his views may now represent those of a majority on the present court. (See, e.g., *Ross* v. *Moffitt* (1974) 417 U.S. 600, 609-612, 618-619 [41 L.Ed.2d 341, 350-352, 355-356, 94 S.Ct. 2437]; *Cupp* v. *Naughten, supra,* 414 U.S. at pp. 144-146, 149-150 [38 L.Ed.2d at pp. 372-373, 374-376]; *Chaffin* v. *Stynchcombe* (1973) 412 U.S. 17, 21-23, 29-35 [36 L.Ed.2d 714, 720-722, 725-729, 93 S.Ct. 1977]; see also Friendly, *Mr. Justice Harlan, As Seen by a Friend and Judge of an Inferior Court* (1971) 85 Harv.L.Rev. 382, 388.) Thus we are led to be especially cautious of perceiving federal constitutional error in this case.

timing. Were the order reversed, the alleged violator could be held on high bail or without bail if he were a poor bail risk. If there were a criminal conviction, the subsequent violation decision would be simple; if there were an acquittal, the court conducting the violation hearing could proceed with full knowledge of that result, remaining free to weigh evidence by a lower standard, but having in mind the acquittal. The result is apt to be, if not also [to] appear, more just.

". . . . . . . . . . . . . . . . . .

"Perhaps . . . it would be preferable for the state to have held the violation hearing after the criminal trial. The Constitution, however, does not require the state, in every case, to adopt what appear to be preferable procedures. On the record before us, we are unable to find any basis for saying that the occasional unfairness which results from the state's ordering of the two proceedings, and convicting at the violation hearing while acquitting at the subsequent criminal trial, reaches unconstitutional proportions." (499 F.2d at pp. 104-105.)

We are in a position to act on nonconstitutional grounds unavailable to federal courts. We are not constrained by notions of federalism to limit our demands for procedural fairness to the rudimentary rather than the reasonable. (See, e.g., *People* v. *Vickers, supra,* 8 Cal.3d at pp. 461-462; *Bryan* v. *Superior Court* (1972) 7 Cal.3d 575, 587-589 [102 Cal.Rptr. 831, 498 P.2d 1079].) It is our duty to insure that the administration of justice in California operates as fairly as is feasible, by insisting to the utmost practicable extent that arbitrary factors not be allowed to influence the judicial decision-making process. Only in this way will our legal system realize its ideal "that the judicial should be equated with the just." (*Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 286 [110 Cal.Rptr. 201, 515 P.2d 1], cert. den. (1974) 417 U.S. 932 [41 L.Ed.2d 235, 94 S.Ct. 2643].)

As we turn to fashioning the details of the relief to be accorded defendant through our supervisory powers, it is important to emphasize that no third party's rights are among the constitutional interests demanding accommodation at a pretrial probation revocation hearing. Where third parties' rights are involved the accommodation of conflicting interests in concurrent legal proceedings may not be so easy as is here the case. (Cf. *Gordon* v. *Federal Deposit Insurance Corporation, supra,* 427 F.2d at p. 580.) The only problem to be resolved in the instant case is the danger of abuse by the state of its opportunity to coerce self-

incriminatory testimony by scheduling the probation revocation hearing in advance of trial. Both the state and the probationer have an interest in resolving the probation issue while the evidence is fresh, but this consideration applies equally to the concurrent criminal proceedings to which both the state and the probationer are also party. We see no reason why the state should be encouraged to schedule revocation hearings in advance of trial as a matter of course by being allowed to use at trial the testimony of the defendant at a prior probation revocation hearing.

## V

We accordingly declare as a judicial rule of evidence that henceforth upon timely objection the testimony of a probationer at a probation revocation hearing held prior to the disposition of criminal charges arising out of the alleged violation of the conditions of his probation, and any evidence derived from such testimony, is inadmissible against the probationer during subsequent proceedings on the related criminal charges, save for purposes of impeachment or rebuttal where the probationer's revocation hearing testimony or evidence derived therefrom and his testimony on direct examination at the criminal proceeding are so clearly inconsistent as to warrant the trial court's admission of the revocation hearing testimony or its fruits in order to reveal to the trier of fact the probability that the probationer has committed perjury at either the trial or the revocation hearing.

This exclusionary rule allows the state to continue to press for revocation of probation either before or after a probationer's trial on related charges, but insures that this scheduling discretion will not be influenced by the illegitimate desire to gain an unfair advantage at trial. Objection to prosecutorial use of revocation hearing testimony or its fruits may be made at trial, although it is to be hoped that the prosecution will whenever practicable anticipate the probationer's objections, and that the probationer will cooperate in securing pretrial resolution of his objections. At the least, it is incumbent upon the prosecution to give sufficient notice to the probationer before seeking to introduce revocation hearing testimony to allow him to press his objections prior to any prejudicial exposure of the testimony to the jury.[19] Both parties bear responsibility for having such objections resolved with a minimum of interruption to the normal course of trial.

---

[19]The prosecution should also be prepared to present the revocation hearing testimony, if admitted, in a form which disguises the nature of the legal proceeding in

The evidentiary standards to be used in determining the admissibility at criminal proceedings of the probationer's testimony at his revocation hearing or evidence allegedly derived from that testimony, are based on those applicable to a claim that evidence has been gained directly or indirectly through an illegal search or seizure, a coerced confession, or some other sort of illegal or improper official conduct.[20] ■ When a

which the testimony was adduced, so that the jury—unless already otherwise so informed—remains unaware of the fact that the accused has previously been convicted of a crime. (Cf. Evid. Code, § 352; *People* v. *Beagle* (1972) 6 Cal.3d 441, 451-453 [99 Cal.Rptr. 313, 492 P.2d 1]; *People* v. *Chacon* (1968) 69 Cal.2d 765, 777-778 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454]; see also *Boyd* v. *United States* (1892) 142 U.S. 450, 458 [35 L.Ed. 1077, 1080, 12 S.Ct. 292]; *Ralls* v. *Manson* (D.Conn. 1974) 375 F.Supp. 1271, 1286-1291, revd. on other grounds (2d Cir. 1974) 503 F.2d 491.)

[20]The evidentiary standards relating to claims for the exclusion of evidence due to official misconduct are somewhat vague, presumably because courts are more troubled by whether certain facts constitute legally proscribed official conduct, than by disputes as to what the facts are. Nevertheless, the following propositions may be distilled from the available authority:

The defendant generally bears the burden of proving that some sort of official misconduct has occurred (see *Kastigar* v. *United States* (1972) 406 U.S. 441, 461-462 [32 L.Ed.2d 212, 226-227, 92 S.Ct. 1653]; *Murphy* v. *Waterfront Comm'n, supra,* 378 U.S. at p. 103 [12 L.Ed.2d at p. 709] (concurring opinion of White, J.); *Nardone* v. *United States* (1939) 308 U.S. 338, 341 [84 L.Ed. 307, 311, 60 S.Ct. 266]), but there are exceptions. Under both federal and California law the prosecution bears the burden of proving the legality of statements obtained during custodial interrogation in the absence of counsel. (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 479 [16 L.Ed.2d at p. 726]; *United States* v. *Hayes* (4th Cir. 1967) 385 F.2d 375, 377, cert. den. (1968) 390 U.S. 1006 [20 L.Ed.2d 106, 88 S.Ct. 1250]; *People* v. *Dorado* (1965) 62 Cal.2d 338, 352-354 [42 Cal.Rptr. 169, 398 P.2d 361], cert. den. (1965) 381 U.S. 937, 946 [14 L.Ed.2d 702, 710, 85 S.Ct. 1765, 1793].) Federal law also requires the prosecution to prove the legality of a warrantless search (see *United States* v. *Cooks* (7th Cir. 1974) 493 F.2d 668, 670; cf. *United States* v. *Matlock* (1974) 415 U.S. 164, 177-178, fn. 14 [39 L.Ed.2d 242, 253, 94 S.Ct. 988]), once the defendant has proven his standing to object to the evidence so seized. (*Wilson* v. *United States* (10th Cir. 1955) 218 F.2d 754, 757; cf. *Simmons* v. *United States, supra,* 390 U.S. at pp. 389-394 [19 L.Ed.2d at pp. 1256-1259].) California does not require proof of standing to object to illegally seized evidence (*People* v. *Martin* (1955) 45 Cal.2d 755, 761 [290 P.2d 855]), and imposes on the prosecution the burden of proving the legality of warrantless seizures and arrests as well as warrantless searches. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].) California also requires the prosecution to prove the voluntariness of a confession. (*People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; contra, *Kastigar* v. *United States, supra,* 406 U.S. at p. 462; but see *Lego* v. *Twomey* (1972) 404 U.S. 477, 484, 489 [30 L.Ed.2d 618, 624, 627, 92 S.Ct. 619].)

Once the fact of official misconduct has been established, the defendant also bears the burden of establishing a prima facie causal link between the "primary illegality" and any secondary evidence allegedly derived therefrom. (*Alderman* v. *United States* (1969) 394 U.S. 165, 183 [22 L.Ed.2d 176, 192, 89 S.Ct. 961]; *Murphy* v. *Waterfront Comm'n, supra,* 378 U.S. at p. 103 (concurring opinion of White, J.); *Nardone* v. *United States, supra,* 308 U.S. at p. 341; *United States* v. *Goldstein* (2d Cir. 1941) 120 F.2d 485, 488, affd. (1942) 316 U.S. 114 [86 L.Ed. 1312, 62 S.Ct. 1000]; see generally *Wong Sun* v. *United States* (1963) 371 U.S. 471, 484-488 [9 L.Ed.2d 441, 452-456, 83 S.Ct. 407]; *People* v. *Schader, supra,* 71 Cal.2d at p. 779; *People* v. *Ditson* (1962) 57 Cal.2d 415, 430-441 [20 Cal.Rptr. 165, 369

probationer objects to the admission of testimony he has given at his own probation revocation hearing, he must meet the initial burden of producing evidence (see Evid. Code, §§ 110, 550) that the charges against him are related to the circumstances in issue at his probation revocation hearing. Once this is established, if the evidence is to be admitted the prosecution must either prove by a preponderance of the evidence (see Evid. Code, § 115) that the probationer's revocation hearing testimony is not so related, or establish that it is nevertheless admissible for impeachment or rebuttal purposes under the standards set forth herein. ■ When a probationer objects to the admission of evidence which he contends is the fruit of his revocation hearing testimony, he must meet the burden of producing evidence not only of a relationship between his probation revocation proceeding and the criminal charges against him, but also of a relationship between his revocation hearing testimony and the allegedly derivative evidence to which he has objected. Once these prima facie showings have been made, the objection must be sustained unless the prosecution either (1) proves by a preponderance of the evidence the lack of any relationship between the criminal charges and the issues in the revocation proceeding; (2) proves by a preponderance of the evidence the lack of any impermissible relationship between the testimony at the revocation proceeding and the evidence offered in the criminal proceeding; or (3) establishes that the evidence is nevertheless admissible for the limited purpose of impeachment or rebuttal.

The exclusionary rule applies to the fruits of the probationer's prior revocation hearing in order to remove completely any illegitimate incentive to schedule revocation hearings in advance of trial. (Cf. *Miranda* v. *Arizona, supra,* 384 U.S. at pp. 478-479 [16 L.Ed.2d at pp. 725-727].) Moreover, protection against derivative as well as direct use of testimony would seem to be necessary to obtain that testimony over a

---

P.2d 714], cert. gr. (1963) 371 U.S. 541 [9 L.Ed.2d 508, 83 S.Ct. 519], cert. dism. (1963) 372 U.S. 933 [9 L.Ed.2d 769, 83 S.Ct. 885].)

If the defendant meets this burden of "go[ing] forward" (*Alderman* v. *United States, supra,* 394 U.S. at p. 183; cf. Evid. Code, § 110), it is the prosecution's burden to prove either the attenuation of the taint of the primary illegality or the independent origin of the prima facie-tainted evidence. (*Alderman* v. *United States, supra,* 394 U.S. at p. 183; *Murphy* v. *Waterfront Comm'n, supra,* 378 U.S. at p. 103 (concurring opinion of White, J.); *Nardone* v. *United States, supra,* 308 U.S. at p. 341; *United States* v. *Coplon* (2d Cir. 1950) 185 F.2d 629, 636 [28 A.L.R.2d 1041], cert. den. (1952) 342 U.S. 920 [96 L.Ed. 688, 72 S.Ct. 362]; *People* v. *Schader, supra,* 71 Cal.2d at p. 779; *People* v. *Robinson* (1963) 13 N.Y.2d 296, 301 [246 N.Y.S.2d 623, 196 N.E.2d 261]; Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule* (1964) 55 J.Crim. L.C. & P.S. 307, 309-310.)

claim of Fifth Amendment privilege. (*Kastigar* v. *United States, supra,* 406 U.S. 441, 453, 461 [32 L.Ed.2d 212, 221-222, 226]; but see fn. 11, *supra.*) Since it affords protection against both direct and derivative use of a probationer's pretrial revocation hearing testimony, our judicially declared exclusionary rule provides protection "coextensive with the scope of the privilege against self-incrimination," (*id.,* at p. 453 [32 L.Ed.2d at p. 222]), thereby permitting us to decline to decide defendant's constitutional claim that pretrial revocation hearings force probationers to forego their Fifth Amendment right to remain silent at trial. Even if we assume, arguendo, that defendant's constitutional claim has merit, the exclusionary rule we propound today gives probationers all the relief to which they are constitutionally entitled.

Although we have declared a probationer's revocation hearing testimony inadmissible during the prosecution's case in chief, we see no purpose to be served by precluding use of that testimony or its fruits to impeach or rebut clearly inconsistent testimony which the probationer volunteers at his trial. The intent of our exclusionary rule regarding probation revocation hearing testimony is to encourage the fullest possible *truthful* disclosure of relevant facts and circumstances at the revocation hearing by allowing a probationer who does testify at his revocation hearing nonetheless to enjoy unimpaired the full protection of the privilege against self-incrimination at his subsequent trial. This privilege requires the prosecution to prove a defendant's guilt through evidence accumulated through its investigative efforts and not extorted from the defendant himself. ▮ While the privilege against self-incrimination does assure an accused of the right to remain silent at his trial, it does not—at least under modern principles of Anglo-Saxon jurisprudence (cf. *United States* v. *Grunewald* (2d Cir. 1956) 233 F.2d 556, 587-592 (appendix to dissenting opinion of Frank, J.), revd. (1957) 353 U.S. 391 [1 L.Ed.2d 931, 77 S.Ct. 963, 62 A.L.R.2d 1344])—encompass a right of an accused to lie in his own behalf at trial. (See *People* v. *Barnes* (1966) 240 Cal.App.2d 428, 430-433 [49 Cal.Rptr. 470].)

If a probationer does testify at his revocation hearing, he must testify truthfully if his contribution to the proceedings is to have any significance. Because a probationer's truthful revocation hearing testimony may well be incriminating, we have provided that such testimony may not be used by the prosecution to ease its burden of producing evidence of guilt at a later trial. And at that trial the probationer retains his right to remain silent, notwithstanding his having testified at his revocation hearing. If despite the preclusion of any prosecutorial use of his

revocation hearing testimony the probationer nevertheless elects to relinquish his right to remain silent at trial, so be it. At trial, as at his revocation hearing, a probationer who chooses to testify must testify truthfully,[21] if he is to have the benefit of the exclusionary rule announced herein.

It should be noted that the mere fact of the probationer's taking the stand at his trial does not open the door to prosecutorial use of his revocation hearing testimony. The probationer may well have testified truthfully and incriminatingly at his revocation hearing, and yet testify truthfully and exculpatorily at his trial by carefully avoiding contradiction of his revocation hearing testimony. In such an instance, the prosecution cannot seek on cross-examination to go beyond the scope of the probationer's direct testimony by asking him either to admit the truth of or perjuriously to deny his admissions at the revocation hearing. (See *People* v. *Taylor* (1972) 8 Cal.3d 174, 177-178, 182-185 [104 Cal.Rptr. 350, 501 P.2d 918], cert. den. (1973) 414 U.S. 863 [38 L.Ed.2d 83, 94 S.Ct. 35].) To allow the prosecution to elicit expected denials of prior admissions as a stratagem for placing before the trial court inculpatory evidence placed in the prosecution's hands by the probationer himself at his revocation hearing, would eviscerate the ameliorative effect of the exclusionary rule announced herein. That rule seeks to encourage frank disclosures by a probationer at a revocation hearing by assuring him that such candor will not impair his full enjoyment of the policies and protections of the privilege against self-incrimination should the issues at his revocation

---

[21]It bears stating that besides being liable to impeachment if his testimony on direct examination at trial contradicts his testimony at his revocation hearing, a probationer who testifies falsely in either proceeding runs a substantial risk of successful prosecution for perjury. The exclusionary rule fashioned herein is far less pervasive in effect than the exclusionary rules applicable to illegally obtained evidence. It appears that uncounseled admissions obtained in violation of *Miranda* cannot be used as part of the prosecution's case in chief in any trial of the victim of the violation (see *Miranda* v. *Arizona, supra,* 384 U.S. at pp. 476, 479 [16 L.Ed.2d at pp. 724-725, 726]; but see also *Michigan* v. *Tucker* (1974) 417 U.S. 433, 445-452 [41 L.Ed.2d 182, 193-197, 94 S.Ct. 2357]), and under California's vicarious exclusionary rule relating to illegally seized evidence, such evidence has been barred from use against anyone. (See *People* v. *Martin* (1955) 45 Cal.2d 755 [290 P.2d 855].) The exclusionary rule applicable to revocation hearing testimony of a probationer applies only to a prosecution *against that probationer* which concerns the *same conduct as was at issue at the revocation proceeding.* Thus a probationer's revocation hearing testimony, if at odds with evidence adduced in his behalf at a subsequent trial on related charges, would be fully admissible in a perjury prosecution against that probationer or against any other witness whose testimony at the related trial appears false in light of the probationer's revocation hearing testimony. It follows that the exclusionary rule propounded herein is a selective shield unlikely to "be perverted into a license to use perjury by way of a defense . . . ." (*Harris* v. *New York* (1971) 401 U.S. 222, 226 [28 L.Ed.2d 1, 5, 91 S.Ct. 643].)

hearing become the subject of criminal proceedings. Unless the probationer himself broaches the subject by express reference to or contradiction of his revocation hearing testimony, he is entitled to have those proceedings kept entirely separate from his trial on related charges. (Cf. *Walder* v. *United States* (1954) 347 U.S. 62, 65-66 [98 L.Ed. 503, 507-508, 74 S.Ct. 354].)

To allow the prosecution to advert to the probationer's revocation hearing testimony on cross-examination, regardless of the content of the probationer's direct examination, would be an ironic way indeed of honoring at trial a probationer's privilege against self-incrimination. (Cf. *Agnello* v. *United States* (1925) 269 U.S. 20, 35 [70 L.Ed. 145, 150, 46 S.Ct. 4, 51 A.L.R. 409].) To be sure, a probationer who incriminates himself at his revocation hearing would not thus be compelled to *incriminate* himself at trial—rather, in order to *avoid* incriminating himself at trial he would be compelled to *remain silent* at trial. Such compulsion is hardly consistent with the constitutional guarantee which the exclusionary rule propounded herein seeks to extend to a probationer, notwithstanding any admissions he may have made at a related probation revocation hearing: "the fullest opportunity to meet the accusation against him." (*Walder* v. *United States, supra,* 347 U.S. at p. 65 [98 L.Ed. at p. 507].)

 We next wish to make clear that this exclusionary rule does not apply to any proceedings other than the formal, dispositive probation revocation hearing. Generally it is not necessary in California to afford a probationer faced with revocation proceedings a "prerevocation" (*In re Valrie* (1974) 12 Cal.3d 139, 142 [115 Cal.Rptr. 340, 524 P.2d 812]) or "probable cause" (*In re Law* (1973) 10 Cal.3d 21, 26, fn. 4 [109 Cal.Rptr. 573, 513 P.2d 621]) hearing of the type normally provided in the course of parole revocation proceedings. Probation revocation, unlike parole revocation, is in California a judicial proceeding with concomitant procedural benefits for a probationer at all stages of the revocation process. Usually a judicial determination of probable cause precedes the arrest of a probationer for violations of the conditions of his probation, and the formal revocation hearing with its full panoply of *Morrissey* procedural rights occurs relatively soon after the probationer has been deprived of his conditional liberty. Since "the precise nature of the proceedings for [probation] revocation need not be identical" to the bifurcated *Morrissey* parole revocation procedures, so long as "equivalent due process safeguards" assure that a probationer is not arbitrarily deprived of his conditional liberty for any significant period of time

(*People* v. *Vickers, supra,* 8 Cal.3d at p. 458), a unitary hearing will usually suffice in probation revocation cases to serve the purposes of the separate preliminary and formal revocation hearings outlined in *Morrissey.*[22] (*People* v. *Buford* (1974) 42 Cal.App.3d 975, 979-982 [117 Cal.Rptr. 333]; see also *People* v. *Andre* (1974) 37 Cal.App.3d 516, 522 [112 Cal.Rptr. 438]; cf. *In re La Croix* (1974) 12 Cal.3d 146, 153, fn. 3 [115 Cal.Rptr. 344, 524 P.2d 816].) However, in some instances a probationer may be entitled to a preliminary hearing on whether there is probable cause for his probation to be revoked, as where related criminal charges are filed after the commencement of probation revocation proceedings, and the prosecution secures the postponement of the formal revocation hearing until after trial on the related charges.

In such circumstances, the probationer's preliminary hearing on the criminal charges will, upon notice to the probationer, serve as his preliminary "prerevocation" hearing· as well. (*In re Law, supra,* 10

---

[22]Trial courts should bear in mind that even when a probationer has been duly convicted of a new crime, he is entitled to a formal revocation hearing before his probation is revoked and sentence is imposed on the prior offense. Depending on the circumstances, a probationer may have had a prerevocation hearing or its equivalent prior to trial, or revocation proceedings may not even have been initiated against him prior to trial. In either event, the trial court which sentences the probationer for the new offense may not, simply because it happens.to have jurisdiction over the grant of probation for the prior offense, summarily revoke that probation at the time of its imposition of sentence for the new offense.

It is true that a conviction conclusively establishes the fact of a certain course of conduct by the person convicted. (*In re La Croix* (1974) 12 Cal.3d 146, 152 & fn. 2 [115 Cal.Rptr. 344, 524 P.2d 816].) All that need be demonstrated to establish that a violation of probation has occurred is the fact of a new, post-probation conviction, the fact that such conviction or the conduct necessarily involved therein violated a condition of probation, and the further fact that such conviction was suffered by the particular probationer in question. (*Id.*) It does not follow, however, that these facts will necessarily be undisputed by a probationer alleged to have been convicted of a new offense. (See *id.*) Moreover, when a court passes on the ultimate issue of whether probation is to be revoked, the court must decide more than merely whether, in light of an alleged conviction for a new offense, a violation of probation has occurred. If such be the case, the court must go on to decide whether under all the circumstances this violation of probation warrants revocation. (See p. 873, *supra.*) A probationer has a right to be heard and to present evidence on this issue as well as on the threshold issue of whether his probation has in fact been violated, and a probationer thus has a right to a formal revocation hearing notwithstanding his prior conviction of a new offense. The fact of the new conviction does not ipso facto render "the attending circumstances . . . factually undisputed" or leave as "the only matter in issue . . . the legal consequences of an undisputed course of conduct" such that the court may "without hearing any witness, rule on the matter" of the revocation of probation. (*People* v. *Vickers, supra,* 8 Cal.3d 451, 457, fn. 6.) Thus, "summary resolution of the issue of revocation" (*id.*) is not appropriate following a probationer's conviction of a new offense unless the probationer waives his right to a formal revocation hearing.

Cal.3d, at p. 27.) Where the related criminal charges have been brought by indictment rather than information or allege only misdemeanors, some other type of hearing may be required under *Morrissey* and *Vickers*. This is especially true if the probationer is to be deprived of his freedom under the aegis of the probation revocation hearing and yet by reason of an intervening but not immediate trial is denied the customarily speedy formal revocation hearing. In such circumstances, if the probationer wishes to be heard at his preliminary hearing or equivalent proceeding, that is his right. But since no dispositive action is taken at such a hearing neither the pressure on the probationer to make full disclosure of his conduct, nor the interest of the state in having him make such disclosure, is sufficiently compelling to warrant the procedural burden of applying the exclusionary rule to testimony of a probationer adduced at this early stage of the probation revocation process.

Finally, we wish to note that the most desirable method of handling the problems of concurrent criminal and probation revocation proceedings may well be for revocation proceedings not even to be initiated until after disposition of the related criminal proceedings. Where pretrial custody is required of one accused of crime, the state has available to it procedures for requiring bail or otherwise restraining conduct which would render unnecessary immediate resort to the machinery of probation revocation in those instances where the accused happens to be a probationer. (See *In re Underwood* (1973) 9 Cal.3d 345, 350-351, fn. 8 [107 Cal.Rptr. 401, 508 P.2d 721]; *Flint* v. *Mullen, supra,* 499 F.2d at p. 105; *id.,* at p. 106 (dissenting opinion).) Where, for whatever reasons, probation revocation proceedings have been initiated in advance of trial on a related charge, there arises a problem of how long a probationer may remain in custody under the aegis of an arrest for violation of a condition of probation, without receiving his formal revocation hearing. (Cf. *Morrissey* v. *Brewer, supra,* 408 U.S. at p. 488 [33 L.Ed.2d at p. 498]: "two months . . . would not appear to be unreasonable.") Of course, a probationer has a right to a speedy trial on the criminal charge, so even if his revocation hearing is postponed until after disposition of the criminal action, that delay will not normally be lengthy absent the probationer's consent thereto. (See Cal. Const., art. I, § 13; Pen. Code, § 1382; *Sykes* v. *Superior Court* (1973) 9 Cal.3d 83 [106 Cal.Rptr. 786, 507 P.2d 90] [60-day standard for speedy trial].)

We do not now decide whether a probationer's consent to a delay in trial is to be deemed to extend to the consequent delay in a revocation

proceeding postponed until after trial. (Cf. *In re La Croix* (1974) 12 Cal.3d 146, 156 [115 Cal.Rptr. 344, 524 P.2d 816].) Nor do we seek now to set standards for the exercise of a court's sound discretion in deciding whether to permit probation revocation proceedings to commence in advance of the disposition of related criminal proceedings, or in deciding, once probation revocation proceedings have so commenced, how long the formal revocation hearing may be postponed due to concurrent criminal proceedings, without violating the probationer's due process right to a reasonably prompt revocation hearing. We do point out, however, that we view it as entirely consistent with the exclusionary rule announced herein and its underlying purposes for a probationer, if desirous of obtaining a speedy resolution of his probation status notwithstanding related criminal liability, to offer to waive the benefit of this exclusionary rule if the court will allow the probation revocation hearing to proceed in advance of disposition of the related criminal liability.

The exclusionary rule announced herein has been fashioned in the interest of the sound administration of justice. The same interest requires that, aside from the instant case, the rule be given prospective effect only. The rule is accordingly declared to be applicable only to probation revocation proceedings held on or after the date of the filing of this opinion.

The order revoking probation is reversed, and the cause is remanded to the superior court for further proceedings not inconsistent with this opinion.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Burke, J.,* concurred.

On May 1, 1975, the opinion was modified to read as printed above.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.