Filed 4/28/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RONALD RAY ANDERSON,<br><br>        Defendant and<br>        Appellant. | A162633<br><br>(Alameda County<br>Super. Ct. No. 69119) |


In 1979, defendant Ronald Ray Anderson was tried for the murders and robberies of Phillip and Kathryn Ranzo, as well as for burglarizing their home.  In the same trial, Anderson was also tried for the separate robbery of Leonard Luna.  With respect to the Ranzos, the jury convicted Anderson of two counts of first degree murder, two counts of robbery, and one count of burglary, and his convictions were affirmed on appeal.  In this appeal from the denial of Anderson's Penal Code[1] section 1170.95 petition, Anderson argues that the trial court prejudicially erred by admitting in his section 1170.95 evidentiary hearing testimony from Anderson's parole suitability hearings, when that testimony should have been excluded under the reasoning of *People v.*

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

*Coleman* (1975) 13 Cal.3d 867 (*Coleman*). We affirm the trial court's order denying Anderson's section 1170.95 petition because we conclude that Anderson has not established that the trial court erred in considering testimony from his parole suitability hearings.[2]

## BACKGROUND

We set forth below the factual recitation from the 1982 unpublished appellate opinion affirming Anderson's convictions.

Leonard Luna was taking care of the home of Bernard Marks, his employer, who was out of town on Sunday, June 24, 1979. The home was located at 3307 West Stuhr Road, Newman.

Between 11:30 p.m. and midnight on June 24, two young men came to the door and asked Luna if he could sell them some gasoline because their car was empty. The two left after Luna provided them with some gasoline, but returned about 15 minutes later and asked if they could use the telephone. As they appeared to be leaving, one of the men turned round with a pistol in his hand and told Luna to hit the floor and close his eyes. Luna complied and then heard a car drive up in front of the house and some more people enter it. He did not know exactly how many.

---

[2] Anderson has also filed a petition for a writ of habeas corpus, which we have considered together with this appeal. We dispose of the writ by separate order.

2

After being hit on his head, Luna was taken into the den where he was placed on a couch and "hog-tied." His hands were tied behind his back and also tied to his feet. On two occasions a person he later identified as Marty Jackson, also known as Marty Spears, said he wanted to "blast" Luna because Luna had seen Jackson's face. Luna was later able to identify Marty Jackson (Spears) and Daniel Geysler as the two who had first come to the door. A large safe on wheels, several guns, a switchblade knife and two watches were missing from the Marks home and it showed signs of having been ransacked.

On June 26, 1979, the bodies of Phillip and Kathryn Ranzo were found at their residence at 1404 Fernview Drive in Modesto. They had failed to appear at their respective places of employment and James Blomquist, Phillip's boss at the pharmacy where he worked, and Carolyn Shaffer, an employee of the beauty salon owned by Kathryn, went to the Ranzo residence. Carolyn Shaffer had called the police because of her concern before going to the Ranzo residence. Blomquist, having found the front door locked, looked in the garage and found Phillip's body lying on the floor. The police arrived about five minutes later.

Officer Hamilton, who had responded to the prior call for a security check of the Ranzo residence, was shown the body of Phillip Ranzo [by] Bloomquist and they then sought to gain entrance to the house. The officer finally had to force a third level door. In the upstairs bathroom the nude body of Kathryn Ranzo was found lying on the floor.

The bodies of both victims had been tied with hands behind the back and also tied to the feet. The cause of death for each was bleeding from multiple stab wounds and the severing of arteries. Phillip had also been hit over the head with a blunt instrument at least six times, causing severe fragmentation of his skull. His wife had also been struck on the head several times with the back of an axe found in the hall next to the bathroom.

The rope used to tie the Ranzos appeared to be identical to that used on Luna in the Newman robbery. The knife wounds sustained by Kathryn Ranzo were of a different kind than those sustained by her husband. Dr. Ernoehazy, Stanislaus County pathologist, testified that her wounds could have been caused by the switchblade knife taken in the Newman robbery.

Officer Hamilton arrived at the Ranzo residence at about 2:15 p.m. of June 26, 1979. Dr. Ernoehazy was summoned and arrived there about 4

4

p.m. It was his opinion that the time of the death of each of the victims was about 16 hours prior to his first examination of the bodies. He fixed the time of their deaths at between 11 p.m. June 25 and 1 a.m. June 26.

The office area and the master bedroom of the Ranzo residence had been ransacked, with drawers pulled out and money, checks, papers and jewelry on the floor. Some money, a Browning automatic shotgun and two pendants, one with diamonds, were found missing by Sam Ranzo, father of the victim Phillip.

On the evening of June 25, 1979, Kathryn and Phillip Ranzo had had dinner at their home with their 10-year-old son, Mark, Phillip's parents, Sam and Marie Ranzo, Mark's friend, Michele Hermann and two of Mark's cousins, Mike and Michele Narzano. Later in the evening the four children and the grandparents went to the grandparents' home, about one block away and around the corner from the victims' home. Mark spent the night with his grandparents.

The children played outside the grandparents' home after dinner. They recalled, in substance, that they had seen an old blue vehicle, with a pickup body, drive by very slowly several times. There were four young male passengers, three in front and one in the

pickup portion in the back. The back also contained some boxes and a trash can. They first saw it around 9:45 p.m. They told grandmother Marie about it and she observed it stopping and backing up at the end of their lot. It was last seen by them about 11:15 p.m. and was then going quite fast.

One neighbor had seen the older model blue El Camino Chevrolet cruising at low speed in front of his house at 1416 Fernview Drive on the afternoon of June 25 between 3 and 5 p.m. His attention was attracted to it because it sounded like "an inboard motorboat" and he thought it had a blown muffler. There were two young men in it, one of whom had hair of the same color as [Anderson]. The occupants were "kind of looking around at the houses."

Another neighbor who lived at 1413 Fernview Drive, across the street from the Ranzo residence, was walking his dog along that street on the evening of June 25. He saw Phillip Ranzo working on one of his autos in the garage at about 10:30 to 11 p.m. He later went to bed and was awakened around midnight by the sound of screeching tires. He got up and looked out the window and saw what looked like a 1959 bluish green El Camino pickup driving at a faster speed than normal along the street in front of his house. It had a noisy muffler. There were two people in the vehicle. He identified a slide picture,

6

16-G in evidence, as that of the vehicle which he had seen that night.

In addition to the facts set forth above from the appellate opinion, the record before us in this appeal contains evidence from trial establishing that Anderson lived with Jackson, and Jackson, Anderson, and two others, D.L. and J.M.—all teenagers—went to the Ranzos' home to commit burglary and robbery. They targeted the Ranzos' home because they believed large amounts of cash were kept therein, and Anderson admitted to Jackson's brother after the robbery that they had committed the robbery. Anderson drove with Jackson around the Ranzos' neighborhood in Jackson's El Camino multiple times in the hours before the robbery. Anderson knew at least one of his confederates was armed with a pistol when he went into the Ranzos' house because Anderson told detectives that he saw a pistol in J.M.'s waistband, and he also said that Jackson grabbed rope from the vehicle and carried it away from the car.

According to trial transcripts, Anderson told police that, before leaving Jackson's house to execute the robbery of the Ranzos, he "overheard" Jackson and the others discussing the possibility of killing the Ranzos, although Anderson claimed he was not involved in the discussion. A police detective testified at trial that Anderson said once they arrived at, and were about to enter the Ranzos' house, Jackson for the second time talked to the others about killing the Ranzos. Anderson told police that he "didn't enter into the conversation." The jury heard evidence that Anderson's then-girlfriend told investigators that Anderson said

7

his role was to wait outside in the El Camino and, if necessary, signal his confederates by driving around and honking if anyone came. Anderson also told investigators he "considered himself as the watchman."

When Anderson's three confederates went into the Ranzos' home, Anderson remained with the truck. According to Anderson, D.L. and J.M. returned to the truck about 20 minutes later with a manila envelope, leaving Jackson inside the house. D.L. and J.M. came running back and were excited. Anderson, who had the keys to the truck, took D.L. and J.M. to a nearby apartment building and then returned to the same parking spot. After Anderson picked Jackson up, they went in search for J.M. and D.L. They found J.M.'s brother, D.M., at Lisa Swenson's house in the early morning hours of June 26, 1979. Swenson testified that Jackson admitted killing two people because they had seen him. D.M. testified that Jackson said that he had just killed two people, and Anderson asked David where his brother (J.M.) was and threatened to kill D.M. if he did not tell Anderson.

Jackson's father testified that, at about 3:30 a.m. on June 26, 1979, Anderson and Jackson were back at their home and had an envelope full of cash out on the kitchen table that Jackson had brought in from outside the home. After counting the money, Jackson and Anderson each took their share. Jackson's mother testified that, while generally discussing the Ranzos, Anderson told her that "it was a bad scene. . . . It would have made you sick."

Anderson was charged by information with two counts of murder (§ 187), three counts of robbery (§ 211), and one count of first degree burglary (§§ 459, 460, subd. (a)), with a gun enhancement for each count.[3]  The jury found Anderson guilty as charged, and he was sentenced to 25 years to life.

In 2019, Anderson filed a pro se petition seeking relief under section 1170.95 after the Legislature enacted Senate Bill No. 1437.  The court appointed counsel for Anderson, ordered preliminary briefing, and then issued an order to show cause.  Prior to the hearing on the petition, Anderson sought to exclude from the court's consideration his testimony from prior parole suitability hearings, arguing that such testimony should be excluded under *Coleman* and similar authorities.  The court denied the motion, reviewed the materials submitted by the parties relating to the petition, and held a hearing.  The court denied Anderson's petition, finding the prosecution had established beyond a reasonable doubt that Anderson could be convicted of felony murder as a major participant in an enumerated felony who acted with reckless indifference to human life and that he could also be found guilty under a direct aiding and abetting theory.

Anderson timely appealed the trial court's denial of his section 1170.95 petition.

---

[3] Counts 1 through 5 (two counts of murder, two counts of robbery, and one count of burglary) pertain to the Ranzos and count 6 (robbery) pertains to Luna.

9

## DISCUSSION

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) changed the law of homicide by amending the felony murder rule and the natural and probable consequences doctrine as it relates to murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843; Stats. 2018, ch. 1015 § 1.)[4] Senate Bill No. 1437 also enacted section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine prior to Senate Bill No. 1437's enactment to seek relief. (*Gentile*, at p. 843; Stats. 2018, ch. 1015, § 3.) Under the version of section 1170.95 effective at Anderson's hearing,[5] a person seeking relief had to file a petition in superior

---

[4] Senate Bill No. 1437 added section 189, subdivision (e) to the felony murder rule and added subdivision (a)(3) to section 188. (*People v. Gentile, supra,* 10 Cal.5th at pp. 842–843; Stats. 2018, ch. 1015 §§ 2–3.) The former provision provided, "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e)(3).) The latter provision states, "Except [for felony murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

[5] Effective January 1, 2022, the Legislature amended section 1170.95 in several ways, none of which is relevant to our analysis here. (Stats. 2021, ch. 551, § 2.) We reference only the version of the statute applicable at Anderson's hearing.

court declaring, among other things, that he or she "could not be convicted of first or second degree murder because of changes to Section 188 or 189" (former § 1170.95, subd. (a)(3)); the trial court then had to determine if the petitioner made a prima facie showing that he or she fell within the provisions of the statute, and, if so, it had to issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts (*id.*, subds. (c), (d)(1)).  At the  evidentiary hearing under section 1170.95, subdivision (d)(1), the prosecution had to "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing."  (*Id.*, subd. (d)(3).)

In his appeal from the trial court's order denying his section 1170.95 petition, Anderson contends the court prejudicially erred in admitting his testimony from prior parole suitability hearings because he should have been afforded use immunity for such testimony.[6]  Defendant relies on *Coleman* and similar decisions to argue that statements made in a parole suitability hearing should be deemed inadmissible in a section 1170.95 evidentiary hearing.  In response, the Attorney General points out that *People v. Myles* (2021) 69 Cal.App.5th 688 (*Myles*) recently rejected a similar argument.  As explained below,

---

[6] Anderson does not argue on appeal that the evidence admitted at his section 1170.95 evidentiary hearing was insufficient to support the trial court's finding that he was a major participant in the designated felonies who acted with reckless disregard for human life.

Anderson does not establish that he is entitled to use immunity or that *Myles* was incorrectly decided.[7]

In *Myles*, as Anderson does here, the defendant relied on *Coleman* and related authorities to argue that, in her section 1170.95 evidentiary hearing, she was entitled to use immunity for her statements and testimony in connection with her parole suitability proceedings. (*Myles*, *supra*, 69 Cal.App.5th at p. 704.) Our colleagues in Division One disagreed.

First, our colleagues reviewed *Coleman*. "In *Coleman*, the California Supreme Court held a defendant's statement from a probation revocation proceeding could not be used against him by the prosecution to lighten its burden of proof at trial. [Citation.] The court reasoned that a defendant should not be compelled to choose between the privilege against self-incrimination at trial and the exercise of the right to be heard at a probation revocation hearing. [Citation.] To resolve the tension between competing rights, the court created a ' "judicially declared exclusionary rule" ' that a probationer's revocation hearing testimony is inadmissible during the prosecution's case-in-chief. The intent of the rule 'is to encourage the fullest possible truthful disclosure of relevant facts and circumstances at the revocation hearing by allowing a probationer who does testify at his revocation hearing nonetheless to enjoy unimpaired the full protection of the

---

[7] Anderson testified at a number of parole suitability hearings throughout the years. Given our denial of Anderson's claim that this testimony was improperly admitted, we need not describe this testimony herein.

12

privilege against self-incrimination at his subsequent trial.' "
(*Myles, supra,* 69 Cal.App.5th at p. 705.)

     *Myles* next found the defendant's reliance on *Coleman* and its progeny unavailing: "The Fifth Amendment privilege against self-incrimination protects persons from being compelled by ' "governmental coercion" ' to serve as witnesses against themselves in ' "any criminal case." ' (*People v. Tom* (2014) 59 Cal.4th 1210, 1223, 1222 [ ].) A section 1170.95 hearing, however, ' "is not a trial de novo on all the original charges." [Citation.] Rather, it is a postconviction proceeding "due to the Legislature's inclusion of section 1170.95 in Senate Bill No. 1437 . . . , [as] an 'act of lenity' [citation], allowing for the retroactive application of the new law governing accomplice liability for felony murder [citation] for defendants already serving valid sentences for murder." ' " ([*People v.*] *Williams* [(2020)] 57 Cal.App.5th [652,] 661, quoting *People v. Wilson* [(2020)] 53 Cal.App.5th [42,] 53; see, e.g., *People v. Anthony* [(2019)] 32 Cal.App.5th [1102,] 1156 [§ 1170.95 petitioners do not have 6th Amend. trial rights].) Because a sentence modification under section 1170.95 is an act of lenity and not a criminal trial, the wrongful admission of evidence does not implicate defendant's constitutional rights under the Fifth Amendment." (*Myles, supra,* 69 Cal.App.5th at pp. 705–706.)

     Finally, *Myles* rejected the defendant's argument that use immunity should have been recognized for the additional reason that the Fifth Amendment protects individuals from government coercion, but "defendant was not compelled to file a section

1170.95 petition, nor to testify at her parole hearing, nor to participate in her risk assessment interview. Indeed, as the trial court noted and defendant acknowledges, parole cannot be conditioned on admission of guilt to a certain version of the crime. (§ 5011, subd. (b); Cal. Code Regs., tit. 15, § 2236; *In re Swanigan* (2015) 240 Cal.App.4th 1, 14 [parole board cannot rely on fact that inmate insists on his innocence to deny parole]; *In re McDonald* (2010) 189 Cal.App.4th 1008, 1023 [" 'the express provisions of Penal Code section 5011 and section 2236 of title 15 of the California Code of Regulations prohibit requiring an admission of guilt as a condition for release on parole'].) . . . Having chosen to be truthful in the assessment interview and testify truthfully at the parole hearing, it is not fundamentally unfair to admit that information during a resentencing proceeding voluntarily initiated by defendant bearing on some of the same issues." (*Myles*, *supra*, 69 Cal.App.5th at pp. 705–706.)

Anderson argues that *Myles* is incorrect because *Coleman* was not decided on constitutional grounds, therefore "whether the Fifth Amendment is applicable to a section 1170.95 proceeding is not determinative as to whether *Coleman* should apply." In so arguing, Anderson ignores the fact that a central justification for the creation of *Coleman*'s exclusionary rule was the need to protect a defendant's constitutional privilege against self-incrimination.

In *Coleman*, the district attorney initiated probation revocation proceedings on grounds that were also the basis for

14

independent criminal charges, and the court revoked the defendant's probation after he declined to testify at the revocation hearing.  (*Coleman*, *supra*, 13 Cal.3d at p. 871.)  The defendant argued that holding the probation revocation hearing prior to his criminal trial denied him procedural due process because he was forced to forego the opportunity to testify at his revocation hearing to avoid incriminating himself at trial.  (*Ibid.*)  Observing that federal law did not clearly require a grant of immunity for the probation revocation testimony, our Supreme Court declined to decide the constitutional question.  (*Id.* at pp. 878, 888–889.)  Instead, it fashioned a "judicial rule of evidence" providing that, upon objection, the defendant's probation revocation hearing testimony and evidence derived therefrom is inadmissible against the probationer during subsequent proceedings on the related criminal charges, save for impeachment or rebuttal.  (*Id.* at p. 889.)  The rationale for this rule was "that a defendant should not be compelled to choose between the privilege against self-incrimination at trial and the exercise of the right to be heard at a probation revocation hearing" (*Myles*, *supra*, 69 Cal.App.5th at p. 705), and the court made clear that its rule afforded  protection " 'coextensive with the scope of the privilege against self-incrimination.' " (*Coleman,* at p. 892, citing *Kastigar v. United States* (1972) 406 U.S. 441, 453, 461.)  Thus, the existence of the defendant's constitutional privilege against self-incrimination in the subsequent criminal trial was integral to the justification for the exclusionary rule announced in *Coleman*.

Indeed, all the use immunities in the authorities upon which Anderson relies prevented evidence elicited in various proceedings from being introduced against a defendant as evidence of guilt in a subsequent criminal or juvenile delinquency proceeding.  (See, e.g., *Bryan v. Superior Court* (1972) 7 Cal.3d 575, 586–589 [statements made by a minor to probation officer and to court in a fitness hearing could not be introduced as substantive evidence against minor in criminal trial]; *In re Wayne H.* (1979) 24 Cal.3d 595, 602 [minor's statements to probation officer inadmissible for any purpose to prove criminal guilt in juvenile or adult proceeding]; *In re Jessica B.* (1989) 207 Cal.App.3d 504, 521 [statements made by parent in therapy ordered by dependency court inadmissible in parent's criminal trial]; *Sheila O. v. Superior Court* (1981) 125 Cal.App.3d 812, 816–817 [testimony given by juvenile at fitness hearing inadmissible in later criminal proceedings]; *People v. Dennis* (1986) 177 Cal.App.3d 863, 876 [defendant's disclosures in support of a motion for a new trial based upon ineffective assistance of counsel inadmissible in subsequent criminal trial]; *People v. Knight* (2015) 239 Cal.App.4th 1, 5–8 [statements made in support of *Marsden*[8] motion inadmissible in criminal trial].) Our Supreme Court has described *Coleman* and its progeny as a "number of decisions by this court granting use immunity in other contexts in which it would be unfair to require the defendant *to choose between maintaining a privilege* and asserting other important rights."  (*People v. Ledesma* (2006)

---

[8] *People v. Marsden* (1970) 2 Cal.3d 118.

16

39 Cal.4th 641, 692, 694–695, italics added [holding disclosure of attorney-client privileged information in a habeas proceeding premised on ineffective assistance pursuant to Evidence Code section 958 did not waive the privilege for purposes of defendant's criminal retrial].)

Ten years after *Coleman*, in two separate decisions, our Supreme Court held that the California Constitution's privilege against self-incrimination mandated the grant of *Coleman*'s use immunity and a similar use immunity for testimony that a minor gives at a fitness hearing and statements the minor makes to her probation officer in connection with that hearing. (*Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 808, 810 (*Ramona R.*); *People v. Weaver* (1985) 39 Cal.3d 654, 659–660 [addressing *Coleman*'s use immunity].) In *Ramona R.*, the first of the two decisions, the issue our Supreme Court addressed was whether use immunity for testimony that a minor gave at a fitness hearing or statements she made to her probation officer remained viable given the passage of Proposition 8, which added section 28, subdivision (d), to article I to the California Constitution.[9] In

_____

[9] Proposition 8 enacted what has been deemed the "Right-to-Truth-in-Evidence" provision in 1982, and it has since been redesignated as article I, section (f)(2) of the California Constitution. (*People v. Guzman* (2019) 8 Cal.5th 673, 677, fn. 3.) This provision states, "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of

17

*Ramona R.*, our Supreme Court examined the genesis of *Coleman*'s use immunity and explained that it was necessary to protect the privilege against self-incrimination. (*Ramona R.*, at p. 809 ["*Coleman* examined in depth the need for use immunities in probation hearings to protect the privilege against self-incrimination."].) The court acknowledged that it had declined to rest *Coleman*'s holding on constitutional grounds, "but only because we deemed such a determination to be unnecessary, as 'our judicially declared exclusionary rule provides protection "coextensive with the scope of the privilege against self-incrimination." ' " (*Ramona R.*, at p. 809, italics added.) The court then held that the use immunity at issue therein was essential to our state constitutional privilege against self-incrimination and was reflected in Evidence Code section 940.[10] (*Ramona R.*, pp. 808–809; *People v. Weaver*, at pp. 659–660 [*Coleman*'s use immunity survived enactment of Right-to-Truth-in-Evidence provision for same reasons stated in *Ramona R.*]; see *People v. Carter* (1993) 19 Cal.App.4th 1236, 1248 ["Though *Coleman* expressed its holding in terms of a judicially devised exclusionary rule, later cases have treated *Coleman* as creating a limited species of use immunity grounded in California's constitutional guarantee against self-incrimination"].) Where the

evidence relating to privilege . . . ." (Cal. Const., art. I, § 28, subd. (f)(2).)

[10] This statute provides, "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him." (Evid. Code, § 940.)

18

privilege against self-incrimination is not implicated, the rationale for immunities at issue in *Coleman* and *Ramona R.* disappears.

Accordingly, the authorities upon which Anderson relies demonstrate that his argument requires him to establish that a constitutional privilege against self-incrimination applied in his section 1170.95 evidentiary hearing. Yet Anderson makes only the conclusory assertion that he "had a constitutional privilege against self-incrimination", and he fails to provide any reasoned supporting argument. Addressing *Myles*, he does not argue that the decision was incorrect because a constitutional privilege against self-incrimination in fact applied in his section 1170.95 evidentiary hearing, nor does he argue that the California Constitution or United States Constitution required the exclusion of his parole suitability testimony. Indeed, the United States Supreme Court has held that the Fifth Amendment applies through original sentencing, but has stated that incrimination is complete in cases in which the sentence has been fixed and the judgment of conviction has become final. (*Mitchell v. United States* (1999) 526 U.S. 314, 326 ["If no adverse consequences can be visited upon the convicted person by reason of further testimony, then there is no further incrimination to be feared."]; see *In re Tapia* (2012) 207 Cal.App.4th 1104, 1111, fn. 3 [noting in dicta that parolee's privilege against self-incrimination ended when his conviction became final].)

For the reasons set forth above, we conclude, as did the court in *Myles*, that "defendant has not demonstrated that the

same principles and rationale underlying the judicially created exclusionary rule formulated in *Coleman* and applicable in criminal trials apply in [his] section 1170.95 resentencing hearing." (*Myles*, *supra*, 69 Cal.App.5th at p. 706.)  The trial court thus did not err in considering Anderson's testimony from his parole suitability hearings.

## DISPOSITION

The order denying Anderson's section 1170.95 petition is affirmed.


BROWN, J.


WE CONCUR:

POLLAK, P. J.
STREETER, J.


*People v. Anderson* (A162633)

20

Trial Court:       Alameda County Superior Court

Trial Judge:      Hon. Morris D. Jacobson

Counsel:          Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

                    Rob Bonta, Attorney General, Lance Winters and Jeffrey M. Laurence, Assistant Attorneys General, René A. Chacón and Juliet B. Haley, Deputy Attorneys General for Plaintiff and Respondent.