Filed 12/29/22  P. v. Hill CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078401 |
| v. | (Super.Ct.No. RIF077884) |
| ANGELA HILL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Matthew Perantoni, Judge.  Affirmed.

Robert F. Somers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

Angela Hill appeals from the trial court's denial of her petition for resentencing under former section 1170.95 (now section 1172.6) of the Penal Code after an evidentiary hearing.[1] (Undesignated statutory references are to the Penal Code.) Hill argues that the trial court erred by considering statements she made at a parole suitability hearing in determining her eligibility for resentencing. We find no error and affirm.

BACKGROUND

In 1998, Hill, her cousin Charles D. Redeaux, Robert S. Seberry, and Nathaniel J. Criss were charged with the first degree murder of Reed Q., with the special circumstance of lying in wait. (§§ 187, subd. (a), 190.2, subd. (a)(15).) The trials of Criss and Hill were severed from those of Seberry and Redeaux.

Seberry pled guilty to voluntary manslaughter for a stipulated state prison term of 11 years, in exchange for testifying against the others. Redeaux was convicted of first degree special circumstances murder.

Criss and Hill were tried together but to separate juries. The jury found Criss guilty of first degree murder and found true the special circumstance. The jury found Hill guilty of first degree murder. The court acquitted Hill of the lying in wait allegation before the case was submitted to the jury. The court sentenced Criss to life imprisonment without the possibility of parole. The court sentenced Hill to 25 years to life. We affirmed the convictions of Hill and Criss. (*People v. Criss* (Mar. 27, 2003, E030952) [nonpub. opn.].)

---

[1] Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6, without any change in text. (Stats. 2022, ch. 58, § 10.)

2

In 2015, Hill petitioned for a writ of habeas corpus, contending that her first degree murder conviction was no longer valid in light of *People v. Chiu* (2014) 59 Cal.4th 155, 166. The People stipulated that the conviction was based on aider and abettor liability under a natural and probable consequences theory, which had become invalid under *Chiu*. The People elected to have Hill's conviction reduced to second degree murder and to have her resentenced accordingly. The court granted the habeas petition, reduced Hill's conviction to second degree murder, and modified her sentence to 15 years to life in prison.

A. *Hill's Resentencing Petition*

In 2019, Hill petitioned under then section 1170.95 to vacate her murder conviction and to be resentenced. The trial court concluded that the statute was unconstitutional and denied the petition. We reversed. (*People v. Hill* (July 9, 2020, E072935) [nonpub. opn.].)

On remand, the trial court issued an order to show cause why Hill was not entitled to relief. The court held a hearing on the petition and took judicial notice of the record from Hill's trial, our opinion on direct appeal, and the transcript from Hill's parole suitability hearing. Defense counsel objected to admission of the parole hearing transcript.

B. *The Trial*

We summarize the relevant facts described in our prior nonpublished opinion in the direct appeal. (*People v. Criss*, *supra*, E030952.)

Hill was in a romantic relationship with Reed. The two lived together for approximately three months until sometime in November 1997.

Several days after Reed moved out, Hill reported to law enforcement that her home had been burglarized. Hill told a friend that she suspected that Reed had done it. Reed later tried to sell the same person some of Hill's property. Hill asked Redeaux to stay at her house because she was afraid.

On November 10, 1997, Redeaux and Hill met with Seberry, one of Redeaux's friends. Hill told the men that Reed had burglarized her home and kicked in her door. Redeaux said he wanted to "fuck the guy up." Hill repeated the story to Criss, who arrived later. Redeaux reiterated that he wanted to "fuck up" Reed. Seberry and Criss agreed to help him do so. They planned to lure Reed to Hill's house.

Hill arranged to pick up Reed later that night. She wanted to spend some time alone with Reed in her bedroom, after which the men could proceed with their plan. Redeaux went with Hill to pick up Reed. Criss and Seberry parked across the street from the apartment where Redeaux and Hill picked up Reed. Shortly after Hill, Redeaux, and Reed arrived back at Hill's house, Criss and Seberry arrived and pretended that they were there to see Redeaux. Everyone went inside. The men smoked methamphetamine. Hill and Reed then went to the bedroom. Hill had given her car keys to Redeaux. Redeaux, Criss, and Seberry drove to a store.

4

Redeaux outlined further details of the plan to attack Reed.  Redeaux told Seberry and Criss to follow his lead and said he would strike first.  The men agreed to a certain signal on which they would begin the attack.

When the men returned from the store, Hill was waiting in the garage and seemed annoyed that they had been gone so long.  Everyone went inside and joined Reed in the bedroom.  Reed became upset and made a rude remark to Hill.  Redeaux took exception to the remark.  Reed took out a pocketknife and started playing with it.  Hill nodded and winked at Redeaux.

Reed exited the bedroom, and Redeaux followed him.  As Reed turned the corner of the hallway, Redeaux attacked Reed.  Criss and Seberry went into the hallway and saw Reed face down on the floor.  Redeaux had Reed pinned down and was punching Reed in the head.  Reed was unable to fight back.

Redeaux then got up and gestured to Criss.  Criss kicked Reed 10 to 20 times on Reed's body and head.  Reed struggled to get up.  Seberry pushed Reed down with his foot.  Criss kicked Reed a few more times.  Reed remained on the floor and made a noise that sounded like "snoring."

Redeaux wrapped cellophane around Reed's head.  Criss helped Redeaux place Reed on a blanket that Hill gave them.  Redeaux told Criss to get an electrical cord, which Criss did.  Redeaux strangled Reed with the cord.  Criss said, "Let's wrap him up." Hill got another blanket and some rope.

5

Redeaux, Criss, and Seberry drove away with Reed's body in the back of a truck and disposed of the body. Before they left, Hill burned Reed's wallet. When the men left Hill's home, she was cleaning blood from the hallway carpet.

After the killing, Hill told a friend and Reed's mother that she had last seen Reed when she dropped him off at a grocery store. The night after the killing, Criss told a friend that "we killed somebody" the previous night. Criss explained that the victim had been "set up." Criss said that he and his companions hung out with the victim to catch him off guard and then attacked him suddenly. Criss explained that he was limping because he had kicked the victim so many times. Criss said that the victim would not die after the beating, so "[w]e put a bag over him," and Redeaux choked him with a wire. Criss told his friend where Reed's body was located.

The friend called law enforcement and relayed what Criss had told him. Reed's body was found several days later. The cause of death was ligature strangulation.

Law enforcement interviewed Criss twice after finding Reed's body. Criss first denied that he recognized Reed or had been involved in assaulting him. Criss then admitted that he was at Hill's home when Reed was there and that there was a discussion earlier that day about assaulting Reed. Criss described the events leading to the attack. Criss acknowledged kicking Reed "a couple of times," injuring his own ankle in the process. Redeaux hit and kicked Reed. Reed began making a "whining" sound, and Criss then kicked Reed two more times. Criss said that Redeaux strangled Reed with a cord.

6

Redeaux testified on Hill's behalf.  He admitted that Hill told him that Reed burglarized her home, but Redeaux denied that Hill asked him to beat up Reed.  Redeaux also denied soliciting Criss and Seberry to help him.  According to Redeaux, no one talked about assaulting Reed on the night of the killing.

Redeaux testified that he offered to drive Reed home after Reed and Hill argued in the bedroom.  In the hallway, Reed turned on Redeaux with a knife.  Redeaux struck Reed in the face, and Reed dropped the knife.  Redeaux got on top of Reed and hit him in the face.  Redeaux claimed that Reed then got up and went after Redeaux again.  Redeaux fought back, and the men ended up on the ground.  Criss kicked Reed two or three times.  Reed started "snoring."  Redeaux denied strangling Reed.

Redeaux claimed that Hill was unaware of the altercation.  Redeaux told Hill that he had "dropped Reed off."

Hill testified on her own behalf.  She claimed that she never asked anyone to threaten or to assault Reed for burglarizing her home.  Hill denied asking Criss and Seberry to follow her to Reed's house.  Hill said that she took Redeaux with her to pick up Reed because she was unsure what "type of mood" Reed would be in.  But she intended to ask Reed to come to her house.

Hill testified that she was unaware of anything unusual taking place at her home.  She and Reed had sex in her bedroom.  Redeaux, Seberry, and Criss went to the store.  Afterward, all the men smoked methamphetamine.  Redeaux said he would take Reed home.  Hill remained in her bedroom and listened to music.  She did not know there was

7

a fight in the hallway. She denied cleaning the carpet or burning the contents of Reed's wallet. She claimed not to have noticed any blood on the carpet later that night. Hill assumed that Redeaux had taken Reed home.

C. *2016 Parole Suitability Hearing*

In 2016, Hill described her crime at a parole hearing. She explained that at the hearing she intended to honor Reed and his family by being truthful about what happened for the first time.

Reed had burglarized her home twice and also kicked in her door twice. She called law enforcement on both occasions. Redeaux then came to stay with Hill. Reed called Hill's mother and aunt and would not stop. Redeaux suggested that Reed needed "his ass beat," and Hill agreed. Redeaux and Hill went to Redeaux's friend's house, and she told Criss and Seberry about the burglary and told them that she wanted Reed beaten up. Redeaux told Seberry and Criss that Reed would have drugs on him, so they agreed to beat up Reed.

At Hill's home later that night, they all planned the attack. Hill devised the plan to pick up Reed, with Criss and Seberry following her and Redeaux. She wanted Reed to believe it was a "honeymoon period" between them. She directed Seberry and Criss to pretend like they were showing up at her home coincidentally.

When planning the attack, everyone talked about beating up Reed. But Hill "knew that Reed could be killed in the midst of the beating, and [she] was okay with it."

After they picked up Reed and everyone was at her house, Hill and Reed went into her bedroom. Hill had sex with Reed in order "to put him at ease" and knew that he would be hurt afterward. Reed became jealous after they had sex and followed Hill into the bathroom with a "little pocket knife." Reed did not threaten Hill but "came in behind [her], and he just sat his arm on [her] shoulder, had the knife in his hand," and stood there for a couple of seconds.

Redeaux, Criss, and Seberry had been gone at a store. When they returned, they smoked methamphetamine with Reed. Reed accused the men of stealing methamphetamine from him and made a rude remark to Hill. "And that's when [Hill] told [Redeaux] to go get [Reed], and that's when [Redeaux] followed [Reed] out and punched him in the hallway." Hill confirmed that she was directing the attack to some extent because she told Redeaux "to go get [Reed], don't let him go."

Hill remained in the bedroom and was not in the hallway, but she knew that Redeaux followed Reed. She heard a "bang," and Criss and Seberry went into the hallway. Hill went into the hallway too and saw Redeaux standing over Reed, but she said the beating was not yet "severe." Hill asked Reed if he was ready to leave her alone, and Reed responded, "F you, and these N words, too." Hill responded to Reed in kind and walked away. As she was walking away, she saw Criss kick Reed in the head.

When Hill returned to Reed's location, Redeaux and Criss were standing on either side of Reed and they were both holding onto an electrical cord and strangling Reed. Hill "didn't say stop." Hill could have stopped the murder "at any time, but [she] chose not

9

to." She "wanted it to go all the way through." When she realized Reed was being strangled, she "was okay with it."

Asked if she wanted Reed murdered, Hill responded, that she did not "in the beginning," because they "never talked about that." Upon reflection, she realized that she "really wanted revenge and [she] really was okay with him being murdered." She wanted the "finality" of death so Reed would stop bothering her.

Hill confirmed that she was the "ringleader" that night and "the driving force" behind the killing. She set "the wheels in motion which resulted in this killing." She admitted that she was the reason that Reed and all three of her codefendants were at her house the night Reed was killed.

D. *The Ruling on the Resentencing Petition*

The trial court denied Hill's petition for resentencing. Considering the record from Hill's trial, our opinion on direct appeal, and the transcript from Hill's parole suitability hearing, the court found "beyond a reasonable doubt, that the evidence is sufficient to establish Ms. Hill acted as a direct aider and abettor of the homicide and acted actually with both expressed and implied malice."

DISCUSSION

Hill argues that the transcript from her parole suitability hearing should have been excluded under Evidence Code section 352 because it was more prejudicial than probative. She also argues that the statements she made in that hearing should have been

10

afforded use immunity under *People v. Coleman* (1975) 13 Cal.3d 867 (*Coleman*). We are not persuaded.

"Murder, whether in the first or second degree, requires malice aforethought. (§ 187.) Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2))." (*People v. Gentile* (2020) 10 Cal.5th 830, 844 (*Gentile*).) "[W]hen a person directly aids and abets a murder, the aider and abettor must possess malice aforethought." (*Ibid.*) "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended section 188 to provide that, with the sole exception of first degree felony murder, a defendant cannot be convicted of murder unless the defendant acted with malice. (§§ 188, subd. (a)(3), 189, subd. (e); *Gentile*, *supra*, 10 Cal.5th at p. 846.) Senate Bill No. 1437 also amended section 189 to impose additional requirements for first degree felony murder liability. (§ 189, subds. (e), (f).) Because of the amendment to section 188, defendants can no longer be convicted of murder under the natural and probable consequences doctrine. (*Gentile*, at p. 851.)

11

Senate Bill No. 1437 also created a procedural mechanism for retroactive application of amended sections 188 and 189 to defendants who were convicted of murder under prior law but could no longer be convicted because of those amendments. (§ 1172.6.)  If such a defendant makes a prima facie showing of eligibility for relief, then the court must issue an order to show cause and conduct an evidentiary hearing, at which the prosecution bears the burden of proof beyond a reasonable doubt that the defendant is guilty of murder under current law.  (*Id.*, subds. (c), (d).)  The admission of evidence at the hearing is generally governed by the Evidence Code, and the parties may "offer new or additional evidence to meet their respective burdens."  (§ 1172.6, subd. (d)(3).)[2]

Hill argues that the trial court abused its discretion under Evidence Code section 352 by relying on the parole hearing transcript, because its probative value was substantially outweighed by its prejudicial effect.[3]  She argues that the "transcript was prejudicial because [she] essentially admitted aider and abettor liability for [Reed's] murder at her parole hearing whereas no other evidence definitely proved her murder

[2]     Senate Bill No. 775 (2021-2022 Reg. Sess.) amended then section 1170.95 effective January 1, 2022.  The hearing on Hill's petition occurred before the amendments took effect.  The prosecutor and the petitioner could admit new or additional evidence under the version of the statute effective when the trial court held the evidentiary hearing on Hill's petition.  (Former § 1170.95, subd. (d)(3).)  Senate Bill No. 775 clarified the evidentiary rules applicable at the hearing.  (Stats. 2021, ch. 551, §§ 1(d), 2.)  Hill does not contend that the statutory changes affected her evidentiary hearing.

[3]     Evidence Code section 352 provides that a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

12

liability." We review a trial court's ruling under Evidence Code section 352 for abuse of discretion (*People v. Lewis* (2001) 25 Cal.4th 610, 637), and we conclude that Hill's argument lacks merit.

Hill's argument is that the parole hearing transcript was prejudicial because it was highly probative of her liability as a direct aider and abettor. The argument fails because it is based on a misunderstanding of what constitutes prejudice under Evidence Code section 352. "Evidence is not 'prejudicial' merely because it is harmful to a criminal defendant's case." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 174 (*Lapenias*).) That is because "essentially all relevant evidence introduced by the prosecution is likely to be harmful to a defendant's case. Evidence only creates 'undue prejudice' if the evidence tends to evoke an emotional bias against the defendant, and the evidence has relatively little importance based on the specific issues involved in the particular case." (*Ibid.*)

We agree with Hill that her admissions at the parole hearing were highly probative of her liability for Reed's murder as a direct aider and abettor. That, however, does not render the evidence prejudicial under Evidence Code section 352. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174.) Hill does not contend that admission of the transcript was prejudicial for any reason aside from its probative value, so we conclude that Hill did not make the requisite showing of prejudice to demonstrate that the trial court abused its discretion by admitting the evidence.

Hill also argues that the trial court abused its discretion under Evidence Code section 352 because "the probative value of the transcript was minimal because it was unreliable." She contends that the "transcript was unreliable evidence to determine murder liability because she was incentivized to inculpate herself in the offense." The argument fails for several reasons. First, the existence of an incentive to give inculpatory or exculpatory testimony may affect the probative value of the testimony, but that relates to the testimony's weight, not its admissibility. (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1051.) Hill had an incentive to exculpate herself when she testified at trial, but that did not render the testimony inadmissible at trial or at the evidentiary hearing on her resentencing petition. Second, to the extent the statements Hill made at the parole suitability hearing were unreliable, the trial judge considering her eligibility for resentencing relief was "ideally situated to determine whether the incentives at a specific parole hearing mesh with the statute's goal of aligning punishment with true culpability. When there are valid reasons to doubt the probity of a parole hearing statement, the trial judge can hear and appraise arguments in the case's context and accord the statement due weight. Trial judges are expert at evaluating—word by word—whom and what to believe in individual situations." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 590 (*Mitchell*).) Third, even if the probative value of the transcript was diminished by Hill's incentive to inculpate herself at the parole hearing, Hill has still failed to show that admission of the transcript carried any risk of undue prejudice within the meaning of

14

Evidence Code section 352. The trial court consequently did not abuse its discretion by admitting the parole hearing transcript.

Hill next argues that the trial court erred by admitting the parole hearing transcript because Hill's statements at the parole hearing were entitled to use immunity under *Coleman*, *supra*, 13 Cal.3d at page 889. We follow the decisions of the Courts of Appeal that have addressed this issue and conclude that *Coleman* use immunity does not apply in this context. (*People v. Myles* (2021) 69 Cal.App.5th 688, 704-706 (*Myles*); *People v. Anderson* (2022) 78 Cal.App.5th 81, 93; *Mitchell*, *supra*, 81 Cal.App.5th at pp. 588-590; *People v. Duran* (2022) 84 Cal.App.5th 920, 930-932 (*Duran*).)

In *Coleman*, the Supreme Court held that "as a judicial rule of evidence" a probationer's testimony at a probation revocation hearing held before the disposition of criminal charges based on the same underlying conduct is inadmissible in the prosecution's case-in-chief during the subsequent criminal trial. (*Coleman*, *supra*, 13 Cal.3d at pp. 889, 892.) In creating that exclusionary rule, *Coleman* balanced the probationer's due process right to be heard at the revocation hearing (*id.* at pp. 873-874) against the defendant's right against self-incrimination at trial (*id.* at pp. 875-878). *Coleman* explained that the purpose of the newly created exclusionary rule was "to encourage the fullest possible *truthful* disclosure of relevant facts and circumstances at the revocation hearing by allowing a probationer who does testify at [the] revocation hearing nonetheless to enjoy unimpaired the full protection of the privilege against self-incrimination at [the] subsequent trial." (*Id.* at p. 892.)

15

The petitioner in *Myles* argued that under *Coleman* the statements she made in her parole suitability hearing should be inadmissible to determine her eligibility for resentencing under then section 1170.95. (*Myles*, *supra*, 69 Cal.App.5th at p. 704.) The Court of Appeal disagreed. (*Id.* at pp. 705-706.) *Myles* explained: "The Fifth Amendment privilege against self-incrimination protects persons from being compelled by "'governmental coercion'" to serve as witnesses against themselves in "'any *criminal case*.'" [Citation.] A section 1170.95 hearing, however, "'is not a trial *de novo* on all the original charges." [Citation.] Rather, it is a *postconviction* proceeding "due to the Legislature's inclusion of section 1170.95 in Senate Bill No. 1437 . . . , [as] an 'act of lenity' [citation], allowing for the retroactive application of the new law governing accomplice liability for . . . defendants already serving valid sentences for murder.'" [Citations.] Because a sentence modification under section 1170.95 [now section 1172.6] is an act of lenity and not a criminal trial, the wrongful admission of evidence does not implicate defendant's constitutional rights under the Fifth Amendment." (*Ibid.*; *Duran*, *supra*, 84 Cal.App.5th at p. 930.)

We agree with and adopt the reasoning in *Myles*, *supra*, 69 Cal.App.5th at pages 705-706. We therefore conclude that Hill's statements at the parole suitability hearing were not entitled to use immunity under *Coleman* and thus were admissible to determine whether she was eligible for resentencing relief.

For all of these reasons, we conclude that the trial court did not err by admitting the parole hearing transcript at the evidentiary hearing on Hill's resentencing petition.

16

## DISPOSITION

The order denying Hill's petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.

We concur:

SLOUGH

Acting P. J.

FIELDS

J.