Filed 3/6/24  P. v. Tanner CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>WILLIE LEE TANNER,<br><br>    Defendant and Appellant. | C098010<br><br>(Super. Ct. Nos. STK-CR-FE-1991-0007040, SC050605A) |

In 1992, defendant Willie Lee Tanner pled guilty to two counts of second degree murder.  (Pen. Code, § 187.)[1]  The trial court sentenced Tanner to two concurrent terms of 15 years to life.  In 2019, Tanner filed a petition for relief under section 1172.6[2] and the trial court denied that petition based on statements Tanner made about his crime at his

---

[1]  Undesignated statutory references are to the Penal Code.

[2]  Tanner filed his petition under former section 1170.95.  Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6 with no change in the text.  (Stats. 2022, ch. 58, § 10.)  We will refer to the statute by its current section number.

parole board hearings. Tanner argues the trial court impermissibly considered these statements. He further argues, that even if the trial court could consider those parole hearing statements, substantial evidence does not support the trial court's findings he intended to kill the first victim or intended to help his fellow gang members kill her. We will affirm.

I

BACKGROUND

In 1992, Tanner pled guilty to two counts of second degree murder arising from two separate incidents. The trial court sentenced him to two concurrent 15-year-to-life terms. (*People v. Tanner* (Feb. 19, 2021, C089864) [nonpub. opn.].) The record does not include the charging documents or transcript of the original plea hearing. However, the trial court described the two incidents as follows:

"As to Count 1, on Sept. 9, 1990, [Tanner] was the driver of a vehicle which was 'chasing' the victims' vehicle. Three individuals were in [Tanner's] car. As [Tanner] drove, two of his passengers fired rifles or shotguns at the victims' car killing Mary O'Reilly by a gunshot wound to her head.

"As to Count 2, on Sept. 25, 1990, [Tanner] was a passenger in a vehicle with three others. This vehicle passed a Seven-Eleven where victim Dwayne Murphy was seated in his vehicle. [Tanner's] vehicle then drove behind this convenience mart whereupon [Tanner] and another exited the vehicle. [Tanner] and the other person were armed with handguns and rifles. [Tanner] and the other then proceeded to fire these weapons, striking victim Murphy in the chest and back. Of note, the factual basis also included [Tanner's] statement to police that he fired two shots from a revolver before the gun jammed. [Tanner] claimed he was not firing at any particular person or area."

In 2019, Tanner filed a petition for resentencing under section 1172.6, however, the trial court summarily denied the petition for failure to state a prima facie case. Another panel of this court reversed this finding and remanded the proceedings for the

2

trial court to conduct an evidentiary hearing. (*People v. Tanner, supra*, C089864.) On remand, the trial court held an evidentiary hearing in January 2023 by which time Tanner had been released on parole. The People submitted a copy of the abstracts of judgment, the trial court's 2019 order denying Tanner's first petition for resentencing, the probation officer's report on Tanner's fitness to be tried as an adult, and parole hearing transcripts from hearings in 2000, 2014, and 2018.

At the 2000 parole hearing, the parole board chair read portions of the probation report into the record. As to count 1 and the first incident, the account read by the parole board chair stated Tanner volunteered that he might have knowledge of the shooting. As the victims were driving, the rear windshield and right passenger window of their car shattered, passenger O'Reilly slumped over, and she was reported dead at 10:40 a.m. that day. Under oath, Tanner agreed with the chair that he was the driver of the pursuing car and was unarmed, that his three passengers all fired shots at the victim's car, and that they all believed the car had rival gang members in it.

As to the second incident referenced in count 2, the record reflects the victim and several others went into a store to buy beer. The victim came out of the store and stood in front of his car when he was shot and killed. Both events were "gang related," as Tanner believed the victims in both incidents were rival gang members. Tanner admitted this statement of facts was "pretty right." Tanner explained that the car they were chasing in the first incident had come by a week before the murder of O'Reilly and a person in the car had fired upon him and his friends. After the murder, he heard that the car had been auctioned off between the initial shooting and the murder.

Under oath at the 2014 parole hearing, Tanner told the parole board he had been totally immersed as a gang member since he was 12 years old. He was attracted to the fast money, the shiny cars, the pretty women, gang violence, and shootings. He got satisfaction from going back and getting revenge on people who shot at one of his gang members.

He told the parole board that, before the first shooting on September 9, he and "a couple of [his] crimies and other fellow associates" were hanging out when a yellow car drove by a couple of times. The second time it drove by someone came up from the passenger side and started shooting at him and then sped off.

On the night of the September 9 murder, Tanner was out with his friends and one of them noticed what they thought was the same car from which they had been previously shot at drive by. Tanner and a "few of [his] crimies" jumped in the car with Tanner driving. At the time, their only thought was revenge. Tanner stated he did not need a gun that night because he was with friends, and he knew they had guns. Tanner pulled up to the side of the car and, before he knew it, gunshots exploded from his car. No one was able to see into the other car because it was dark and there were no lights on the street.

Echoing his previous testimony, Tanner said he learned a few weeks later that the gang members had auctioned the car off to the victim's family. Tanner told the parole board, "come to find out that the people that we thought was in the car wasn't in the car. And then I told the guys that I hung out with . . . that wasn't . . . the person that we thought it was. Because that car had belonged to . . . a guy named Terrell at the time, which was known as an older guy that was a rival gang member of ours at the time." Tanner said, I am going to be "totally honest with you, if I wouldn't have got captured . . . at the time that I did it probably would have been more murders, you know, because like I said I was living a reckless life." He continued, there "probably would have been more crime and things of that nature, probably more bodies at the time."

At the 2018 parole hearing, Tanner repeated the same set of facts under oath as before. He affirmed that the people in his car could not see into the rival's car, so they just shot into it on September 9. He also said, "[c]ome to find out later that it was a [case of] mistaken identity."

On this record, the trial court concluded the evidence established beyond a reasonable doubt that Tanner is guilty of second degree murder as a direct aider and

4

abettor with the requisite intent to kill as to both counts 1 and 2. The trial court denied Tanner's section 1172.6 petition. Tanner filed a timely notice of appeal.

II

DISCUSSION

Tanner argues the trial court could not properly consider his admissions from his parole hearings to support its finding he is ineligible for relief under section 1172.6. He further argues that, even if the trial court could consider that evidence, substantial evidence does not support the trial court's finding he had the intent to kill or to help his friends kill the victim. We disagree.

A.      *Senate Bill No. 1437*

Under section 187 an unlawful killing with malice aforethought is murder. Under section 188, express malice is the "deliberate intention to unlawfully take away the life of a fellow creature." Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

In relevant part, Senate Bill 1437 "amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' (§ 188, subd. (a)(3), added by Stats. 2018, ch. 1015, § 2.)" (*People v. Harden* (2022) 81 Cal.App.5th 45, 51; see *People v. Strong* (2022) 13 Cal.5th 698, 707-708.) This new language eliminated the use of the natural and probable consequences doctrine in murder prosecutions; however, it did not affect the doctrine of "personally possessing malice aforethought a necessary element of murder." (*People v. Gentile* (2020) 10 Cal.5th 830, 846.) Put another way, Senate Bill 1437 bill did not "eliminate direct

5

aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*Gentile,* at p. 848.)

Senate Bill 1437 also added what is now section 1172.6, which provides the procedure by which those convicted of murder premised on either a felony murder or natural and probable consequences theory can petition for resentencing and attempt to establish that they could not now be convicted of first or second degree murder because of changes made by the bill to sections 188 or 189. (Stats. 2018, ch. 1015, § 4.)

Upon the issuance of an order to show cause, the prosecution has the burden to "prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) Section 1172.6 sets forth the procedural requirements for that evidentiary hearing. Admission of evidence is governed by the Evidence Code, "except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. . . . The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

B. *Tanner's Parole Hearing Testimony*

Tanner bases his argument on the dissent of Justice Stratton in *People v. Mitchell* (2022) 81 Cal.App.5th 575, 602-605 that the trial court should not have considered any statements he made at his parole hearing in deciding his petition for resentencing. The People contend Tanner forfeited this challenge to the admissibility of the parole hearing transcripts on the basis it violated his Fifth and Fourteenth Amendment rights against self-incrimination because he failed to object on those grounds below. We agree with the People.

6

"A defendant may not challenge the admissibility of evidence on appeal if he or she failed to raise a proper objection on those grounds in the trial court. (Evid. Code, § 353, subd. (a) [error in admitting evidence may not be basis for reversal of judgment unless 'an objection to or a motion to exclude or to strike the evidence . . . was timely made and so stated as to make clear the specific ground of the objection or motion']; *People v. Anderson* (2001) 25 Cal.4th 543, 586 ['a challenge to the admission of evidence is not preserved for appeal unless a specific and timely objection was made below'].) 'The objection requirement is necessary in criminal cases because a "contrary rule would deprive the People of the opportunity to cure the defect at trial and would 'permit the defendant to gamble on an acquittal at his [or her] trial secure in the knowledge that a conviction would be reversed on appeal.' " ' (*People v. Partida* (2005) 37 Cal.4th 428, 434.)" (*People v. Myles* (2021) 69 Cal.App.5th 688, 696.)

Here, Tanner objected below that the evidence should not be admitted because the prosecution did not establish the corpus delecti for the crime, and the testimony was hearsay that was both unreliable and failed to fit under any exception to the hearsay rule. Tanner did not object that the evidence was inadmissible as a violation of his right against self-incrimination. (See *People v. Partida* (2005) 37 Cal.4th 428, 435 [to preserve claim on appeal, objection below must have been made on same grounds].) Thus, he forfeited the right to challenge this evidence on that basis now.

Tanner urges us to conclude that his objection below was not required to preserve this issue because this is a pure issue of constitutional law based on undisputed facts and an objection on this ground would have been futile. While we do generally have the discretion to decide issues raised for the first time on appeal, that authority "is constrained by [a] specific statutory command when the issue concerns the admission or exclusion of evidence. (Evid. Code, § 353 [judgment shall not be reversed 'by reason of the erroneous admission of evidence' unless timely and specific objection is made in the

7

trial court].)" (*People v. Myles, supra*, 69 Cal.App.5th at pp. 696-697; *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

Further, we conclude any objection would not have been futile given that the building blocks upon which Tanner develops his argument here existed prior to the resentencing hearing. (See, e.g., *People v. Coleman* (1975) 13 Cal.3d 867 and the dissent in *People v. Mitchell, supra*, 81 Cal.App.5th 575.) Tanner's good faith objection on this basis, which we understand may have been a challenge, would not have been a futile act, but rather would have properly joined the issue and allowed us to review the trial court's decision on that point.

C. *Substantial Evidence*

Tanner argues there is no substantial evidence supporting the trial court's finding he had the intent to kill during the September 9, 1990 murder. We disagree.

In reviewing a trial court's finding that the prosecution has proven the defendant is guilty of murder under current law, "[w]e review the trial judge's factfinding for substantial evidence." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate, and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Ibid*.)

As noted, *ante*, there is no trial record. Thus, the trial court was left with the statements Tanner made during his three parole hearings. Tanner's statements under oath to the parole board established Tanner saw a person in a yellow car shoot at him a week

or two prior to the September 9 murder. On the night of the murder, his friends saw the same car drive by again.

When his friend alerted him to the presence of the yellow car, Tanner jumped into a car with three of his fellow gang members whom he knew were armed. He raced down the street to catch up with the yellow car. Tanner testified no one could see into the car because it was late, it was dark, and there were no lights on the street. Tanner stated, "at that time my only thought, our only thought, was revenge." When Tanner caught up to the yellow car, all three of the passengers fired into the car killing the victim.

Further evidence supporting the trial court's finding Tanner had the intent to kill or intended to help his friends kill the actual victim is found in his statement to the parole board that he did not know they had killed the wrong person until a week or more after the fact. In the subsequent hearing, Tanner stated it was not until a few days later that he realized they had not killed a rival gang member, but that they had executed innocent people. Tanner also said he told his friends, "[T]hat wasn't the person that we thought it was."

The facts are that (a) Tanner drove a car to catch up to the yellow car, (b) no one could see into the car at the time of the shooting, (c) they were intent on revenge, and (d) they did not know they killed the wrong person until days after the shooting, all discredit Tanner's claim he and his "crimies" were just trying to see who was in the car and before he knew it gunshots exploded from the car he was driving. Instead, this evidence supports the trial court's finding Tanner had the intent to kill and intended to assist his gang "crimies" in killing the occupants of that car. The fact that Tanner and the others did not know the identity of the yellow car's occupants until after they killed them does not change Tanner's intent to kill and assist his friends in killing the occupants of that car.

The trial court's finding of Tanner's intent to kill is further supported by Tanner's statement there probably would have been more murders if he had not gotten caught, or

9

in his words that there "probably would have been more crime and things of that nature, probably more bodies at the time."

We acknowledge the trial court analyzed Tanner's intent to kill under the felony-murder rule espoused by section 189. The required mens rea of intent to kill under both sections is express malice. Thus, we conclude there is no error in the trial court's decision. (*People v. Campbell* (1994) 23 Cal.App.4th 1488, 1494 ["we review the trial court's result, not its rationale"].) Substantial evidence supports the trial court's finding the People established beyond a reasonable doubt Tanner had the intent to kill and intended to aid his friends in the execution of the victim.[3]

## DISPOSITION

The judgment is affirmed.

_____/s/_____
BOULWARE EURIE, J.

We concur:

_____/s/_____
MAURO, Acting P. J.

_____/s/_____
MESIWALA, J.

---

[3] Because we conclude substantial evidence supports the trial court's finding Tanner had actual malice when he aided and abetted this murder, we do not reach whether there was substantial evidence Tanner had implied malice under the test announced in *People v. Reyes* (2023) 14 Cal.5th 981.